ROBERT S. PINZUR, LTD., Plaintiff-Appellee, v. THE HARTFORD, Defendant-Appellant.

Second District    No. 2—86—0876

Opinion filed July 27, 1987.

872

Louis W. Brydges, Jr., and John C. Polster, both of Brydges, Riseborough, Morris, Franke & Miller, of Waukegan, for appellant.

Lynn Rosenthal Mayer and Scott A. Mayer, both of Mayer & Mayer, of Northbrook, for appellee.

JUSTICE HOPF delivered the opinion of the court:

This appeal is taken by the Hartford, an insurance company, from a grant of summary judgment which awarded attorney fees to plaintiff professional corporation, Robert S. Pinzur, Ltd. Pinzur sought fees pursuant to an alleged statutory attorney's lien on insurance proceeds due to his client. Hartford contends that the trial court erred in enforcing the alleged lien because Pinzur's client had no claim to which a lien could attach and no determination was made that the insurer's conduct was vexatious and unreasonable. Hartford also asserts that the trial court abused its discretion by awarding an excessive amount of attorney fees to Pinzur.

The record reveals the following facts. Hartford issued a group health and disability insurance policy to Buford Television, Inc., in October 1981. Debra Patka worked for Buford and was insured under the Hartford policy. In June 1982, Patka was hospitalized with a gall bladder problem and Crohn's disease. At the time she was admitted to the hospital Patka signed an admission contract which included the following language:

"INSURANCE ASSIGNMENT:

I hereby authorize direct payment to Mease Hospital and Physicians of the proceeds payable under the terms of the policies submitted to Mease Hospital and Clinic in satisfaction of my bill."

Around the middle of August Patka was discharged from the hospital.

When Hartford failed to pay the claims they submitted, various of the providers who had rendered services to Patka began billing Patka directly. She received the first of these billing notices before she was

discharged from the hospital and eventually was threatened with collection agency action. In December 1982 the bills were still unpaid, and Patka obtained the services of Pinzur to secure the benefits she claimed were due under the group insurance policy. According to the terms of a written agreement Pinzur was to receive 33⅓% of the gross amount it recovered from Hartford on behalf of Patka whether by suit, settlement, or otherwise.

Pinzur notified Hartford that it claimed an attorney's lien upon any recovery secured for Patka in letters received by Hartford on December 6, 1982, and December 20, 1982. In the second of these letters Pinzur confirmed a telephone conversation with Hartford in which Hartford had acknowledged its liability to Patka for medical/hospital coverage. Hartford had also explained that the delay in payment of the claim was due to an audit of the individual hospital bills by the insurer's home office and that when the audit was completed, Patka's bills would be paid. A December 27, 1982, letter from Hartford to Pinzur also stated that Patka's file was being reviewed by Hartford's home office. An affidavit and attached exhibits filed by Hartford's health claims manager indicate that an audit of Patka's hospital bill by Hartford discovered an overcharge in the amount of $4,507.66. Another exhibit shows repayment of the overcharge by the hospital.

Starting on January 11, 1983, Hartford began issuing drafts payable directly to the treating hospital and physicians. These checks were made payable only to the providers; Pinzur was not named as an additional payee on any of them. The total amount paid to the providers was $35,757.33. On March 23, 1983, a draft in the amount of $2,313.44, for disability benefits rather than medical expenses, was issued jointly to Patka and Pinzur.

In numerous communications subsequent to its December 14 notice of claim for lien, Pinzur repeatedly demanded that Hartford honor its lien by including it as a payee on drafts to Patka or the various providers. Pinzur's letters of February 1, 1983, February 8, 1983, and March 10, 1983, were directed initially to matters concerning Patka's benefits under the Hartford policy and merely added a request that Hartford name Pinzur as a payee pursuant to its lien. Letters sent by Pinzur on February 16, 1983, May 2, 1983, and June 13, 1983, dealt only with the lien claimed by Pinzur. Ultimately, Pinzur filed suit against Hartford seeking enforcement of its lien.

On June 13, 1986, the trial court denied Hartford's motion for summary judgment and granted Pinzur's cross-motion for summary judgment on the issue of liability. Subsequently, the lower court

granted Pinzur's motion for summary judgment as to damages. Based upon the one-third contingent fee contract between Pinzur and Patka, and the $35,757.33 paid to the providers, the court entered judgment for plaintiff in the amount of $11,917.91. Hartford then timely filed this appeal.

■ Both orders appealed from granted motions for summary judgment. Summary judgment should be granted only when there are no genuine issues of material fact yet to be decided by a trier of fact and the movant is entitled to judgment as a matter of law. (*Marquette National Bank v. Walgreen Co.* (1984), 126 Ill. App. 3d 680, 682, 467 N.E.2d 954; *Bohnen International, Inc. v. Liberty Mutual Insurance Co.* (1983), 120 Ill. App. 3d 657, 662, 458 N.E.2d 644.) Defendant maintains that Pinzur was not entitled to summary judgment as a matter of law.

Hartford raises a threshold legal question regarding the viability of Pinzur's lien. Pinzur had sent Hartford a notice of lien claim pursuant to "An Act creating attorney's lien and for enforcement of same" (hereinafter cited as Attorney's Lien Act or Act) (Ill. Rev. Stat. 1985, ch. 13, par. 14), which states in pertinent part:

> "Attorneys at law shall have a lien upon all claims, demands and causes of action *** which may be placed in their hands by their clients for suit or collection, or upon which suit or action has been instituted, for the amount of any fee which may have been agreed upon by and between such attorneys and their clients *** for the services of such attorneys rendered or to be rendered for their clients on account of such suits, claims, demands or causes of action. *** Such lien shall attach to any verdict, judgment or order entered and to any money or property which may be recovered, on account of such suits, claims, demands or causes of action, from and after the time of service of the notice."

Relying on the language in the admission contract authorizing direct payment to the hospital and doctors, Hartford contends that Patka assigned to the providers her rights under the group insurance policy and thus had no claim, demand, or cause of action to place in Pinzur's hands for suit or collection. Defendant concludes that Pinzur's attempt to enforce his alleged lien is futile since no subject is available to which the lien might attach. We are persuaded by the facts and record of this case that Hartford's argument is ineffective since the admission contract clause on which it relies does not amount to an assignment.

■ ■ First of all, the clause is part of an agreement between

Patka and the provider hospital. It does not appear to us from the agreement that the parties intended the clause to be an assignment. The primary objective in construing a contract is to give effect to the parties' intent, and to discover this intent the various contract provisions must be viewed as a whole. (*Braeside Realty Trust v. Cimino* (1985), 133 Ill. App. 3d 1009, 1011, 479 N.E.2d 1031.) Words derive meaning from the context in which they are used, and contracts must be viewed as a whole by examining each part in light of the other parts. *Board of Trade v. Dow Jones & Co.* (1983), 98 Ill. 2d 109, 122-23, 456 N.E.2d 84.

The subject admission contract contained a number of authorizations in addition to the direct payment clause. Patka authorized the release of information necessary for Medicare or other insurance claims and requested that Medicare payments be made to her or on her behalf. The contract also contained the following clause:

"FINANCIAL AGREEMENT:

The undersigned agrees, whether he signs as agent or as a patient, that in consideration of the service to be rendered to the patient, he hereby individually obligates himself to pay the account of the hospital in accordance with the regular rates and terms of the hospital. Should the account be referred to a collection agency or an attorney for collection, the undersigned shall pay reasonable attorney's fees and collection expenses."

It is evident from the paragraph quoted above that both parties perceived Patka, and not the insurance company, as being liable for payment of the hospital bills. Had the parties intended an assignment it seems that it would have been appropriate to make Patka directly responsible only for any amount not covered by insurance. Otherwise, Patka could have found herself liable to the hospital but unable to recover anything from Hartford because of having assigned away her right to claim insurance proceeds.

In sum, the direct payment clause was couched in the language of authorization and included among other authorization clauses. The financial agreement clause squarely placed the burden of payment on Patka without recognition of any amounts which might be collected from the insurer. Reviewed as a whole, we think the direct payment authorization was intended to be just that and nothing more. It was meant only to facilitate the efficient movement of money from insurer to provider without an intermediate payment to the insured. Such an authorization would decrease the risk to providers that the money might never get to them. In our opinion neither Patka nor the hospital intended to make a legally binding assignment of Patka's

rights under the Hartford policy.

We also note in this regard that, after the fact, the providers did not act as though they had been assigned Patka's rights. There is no evidence that any of them took any legal steps whatsoever to collect from Hartford. On the contrary, the record reflects that billing notices and collection warnings were sent to Patka. Patka evidently did not believe she had transferred any of her rights, either, as it was she who brought suit against Hartford.

Both the admission contract itself and the actions of Patka and the hospital after medical expenses were incurred indicate that the parties to the contract considered the direct payment clause to be merely a matter of efficiency and convenience. There is nothing in the record to show that they perceived the clause as an assignment which transferred any of Patka's rights to the hospital. Since neither of them intended to create an assignment, they may not now be bound at the behest of the insurer and Patka cannot be held to have given up her rights under the Hartford insurance policy.

Even if Patka and the hospital had intended an assignment we still could not enforce the direct payment clause in the way Hartford wishes because the requirements for a valid assignment were not fulfilled. By signing the admission contract Patka authorized Hartford to send directly to the providers any insurance proceeds which might ultimately become payable under her group insurance policy. Those proceeds had not yet accrued. At the time she signed the contract Patka did not know what her medical expenses would be, much less what portion of those expenses would be covered by insurance. Thus, what the alleged assignment purported to transfer to the providers was Patka's present conditional right (Restatement (Second) of Contracts sec. 320 (1979); see also Restatement (Second) of Contracts sec. 321, comment (a) (1979)) to the proceeds or a right she would have after medical expenses were incurred and corresponding insurance benefits became due. A valid assignment of a conditional right will be enforced in equity. (*Dyblie v. Dyblie* (1945), 389 Ill. 326, 59 N.E.2d 657 (expectancy of an heir presumptive); *Lewis v. Braun* (1934), 356 Ill. 467, 191 N.E. 56 (attorney contingency fee); *Holsinger, Theis & Co. v. Holsinger* (1946), 329 Ill. App. 460, 69 N.E.2d 360 (commissions to accrue in succeeding years).) To be valid, however, such an assignment must have been supported by valuable consideration. (*Dyblie v. Dyblie* (1945), 389 Ill. 326, 329, 49 N.E.2d 657; *Dr. Charles W. Smith III, Ltd. v. Connecticut General Life Insurance Co.* (1984), 122 Ill. App. 3d 725, 727, 462 N.E.2d 604; *Holsinger, Theis & Co. v. Holsinger* (1946), 329 Ill. App. 460, 473, 69 N.E.2d 360.) We can find no such

consideration for the assignment Hartford seeks to rely upon.

The direct payment clause itself contains no evidence whatsoever of consideration for an assignment. While the hospital services might be viewed as valuable consideration for an assignment, the financial agreement clause set forth above makes it abundantly clear that the hospital intended to render its services as consideration for Patka's promise to pay her future hospital bills. In fact, the financial agreement is the only clause in the entire contract which mentions consideration or, for that matter, any obligation on the part of the hospital. There is nothing in the language of the financial agreement clause to indicate that the consideration it mentions was being offered to support an assignment of rights in addition to a promise from the insured. In the absence of valuable consideration, the assignment of future rights asserted by Hartford is illusory and cannot serve as a basis for denying that Patka any longer has a claim to rights under her group insurance policy.

We are not dissuaded from our conclusion by Hartford's citation of *Dr. Charles W. Smith III, Ltd. v. Connecticut General Life Insurance Co.* (1984), 122 Ill. App. 3d 725, 462 N.E.2d 604, in which the court found an assignment in favor of a provider and against an insurer. Defendant relies on *Smith* for the proposition that language such as that in the direct payment clause of the instant admission contract creates a valid, binding assignment. While it is true the subject provision in *Smith* authorizes direct payment in language very similar to the clause now before us, in that case the provision was included in proof of claim forms which had been prepared, preprinted, and provided by the insurer. The court found that the insurer intended for the form to be used by its insureds in claiming benefits and that the challenged language invited the realistic expectation that the provider would receive payment directly from the insurer. The court concluded that the insurer, through use of its own form, had brought about the situation with the provider and held that the insurer was estopped from attacking the validity of the form. Thus, in *Smith* an assignment was found by estoppel rather than on the basis that the direct payment language, *per se*, created an assignment. *Smith* does not control the case before us.

■ Nor can Hartford argue that Patka and the hospital should be estopped from denying that the form they executed constituted a valid assignment. The record is quite clear, and Hartford admits, that it received Pinzur's notices of attorney's lien, at both its Chicago and Dallas offices, on December 6, 1982, and December 20, 1982, respectively. The first payment of benefits was not made by Hartford until

January 11, 1983. Hartford cannot now say it was unaware that Patka was not treating the direct payment clause as an assignment but rather was asserting a claim. Nor can defendant assert that it acted unknowingly in reliance on an assignment by Patka. At the very least, Hartford should have withheld direct payments to providers until it received some further authorization from its insured. Hartford could also have filed an interpleader action (Ill. Rev. Stat. 1985, ch. 110, par. 2—409) to determine the rights of all concerned parties. Under the circumstances of this case we agree with Pinzur that the insurer acted to its peril when it paid the proceeds directly to the providers in disregard of the notice of lien claim.

Having decided that Patka had a claim on which a statutory attorney's lien could be based, we next consider Hartford's argument that the trial court committed procedural error warranting reversal. Defendant asserts that an award of fees to Pinzur was improper in the absence of any findings of vexatious and unreasonable delay on its part in honoring Patka's claim. Defendant relies on the following provision in the Illinois Insurance Code (Code):

> "In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees ***." (Ill. Rev. Stat. 1985, ch. 73, par. 767.)

Although a suit was not filed on behalf of Patka, Hartford appears to argue that Pinzur made contact with the insurer on the basis of Patka's assertions that Hartford was unreasonably delaying settlement of her claim. Therefore, according to Hartford, the trial court should have made a determination as to whether delay by Hartford was vexatious and unreasonable. Hartford's argument is without substance.

Pinzur seeks attorney fees pursuant to a lien based upon a contractual agreement with Patka. In effect, assuming any amount at all was recovered from Hartford, not only were Pinzur's fees already set, but the source of these fees had been agreed upon between the parties to the contract. Thus, Pinzur's fees did not depend upon whether or not the insurance company had acted in a vexatious or unreasonable manner. To rule otherwise would be to interfere with Patka's right to contract with Pinzur. There was no need for the trial court to determine whether any delay in payment of benefits was vexatious or

unreasonable.

■ Since we have concluded that the legal issues pertinent to liability raised by Hartford must be resolved in favor of Pinzur, we also conclude that Pinzur was entitled to summary judgment on the issue of liability as a matter of law. It remains for us to determine whether Pinzur was also properly granted summary judgment on the issue of damages.

Hartford contends that the trial court abused its discretion in awarding Pinzur attorney fees of $11,917.91, or one-third of the amount paid to the providers. Defendant launches a two-pronged attack on the judgment. It argues that the award was improper because Pinzur's activities did not cause payment to be made to Patka and asserts that the amount of the award was unreasonable. After a thorough review of the record we are persuaded that the damages issue was improperly disposed of by summary judgment since not all genuine issues of material fact relevant to damages had been previously resolved.

■ We agree with Pinzur that Hartford lacks standing to challenge his fee since Hartford was not a party to the contingency fee arrangement with Patka. (*Hall v. Metropolitan Life Insurance Co.* (1938), 298 Ill. App. 83, 87-88, 18 N.E.2d 388.) Nevertheless, the reasonableness of a contingency fee is closely scrutinized by the court and always subject to court supervision. (*In re Teichner* (1984), 104 Ill. 2d 150, 161, 470 N.E.2d 972; *Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 83, 195 N.E.2d 137.) Such scrutiny is triggered because contingency contracts sometimes lead to solicitation and otherwise bring dishonor upon the law. Also, since such contracts give an attorney a pecuniary interest in the successful outcome of the case, there is a conviction that contingency arrangements must be absolutely fair in order to avoid an adverse effect on the attorney-client relationship. (*Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 83, 195 N.E.2d 137.) It is in light of these principles that we choose to discuss the matter of the fees sought by Pinzur.

As explained earlier, Pinzur claimed a lien pursuant to the Attorney's Lien Act. (Ill. Rev. Stat. 1985, ch. 13, par. 14.) The Act provides that an attorney's lien shall attach to any verdict, judgment or order entered and to money or property "recovered, *on account* of such suits, claims, demands or causes of action" (emphasis added) as have been placed in the attorney's hands by his client. We interpret this language to mean, first of all, that there must be money or property to be "recovered," or secured, from an adversarial party who has refused to turn over what the client claims is due. Second, when the

Act says the recovery is to be "on account" of various actions we believe it means the recovery must be a result of action taken by the attorney. To construe the statutory language otherwise would result in unjust windfalls for attorneys in cases where a defendant acts wholly on its own and no attorney services were rendered. We conclude that an attorney seeking to enforce a lien must show that the judgment or recovery was achieved as a result of services performed by him. In the case before us there was no hearing on this issue, nor did the trial court make any relevant findings.

Neither a hearing nor findings on the issue delineated above would have been called for had the parties agreed on the facts. However, in the record before us, we discern a dispute as to exactly what it was that prompted Hartford to pay Patka's medical bills. Hartford points out, and is supported by the record, that Pinzur neither filed suit, obtained a judgment, nor entered into negotiations or a settlement in order to secure insurance benefits for Patka. In fact, Hartford insists that it never disputed or denied Patka's claim but that payment of her benefits was merely reasonably delayed due to an audit required by the home office. The record shows that Hartford gave this explanation to Pinzur in one of its very first communications with him. There is also some indication that an audit was performed and that an error was found in the hospital bill. There is no record, by letter or otherwise, that Hartford ever told Patka it was disputing or denying her hospital/medical claim. Hartford is adamant in maintaining that Patka's claim would have been paid regardless of Pinzur's involvement.

Although it is clear from the record that approximately 22 letters were exchanged between Pinzur and Hartford, only a limited number of those dealt with Patka's medical/hospital insurance. The rest were concerned with her disability insurance and/or Pinzur's lien, and a number of them were written after most of Patka's medical bills had been paid. We note also that the first payment was made to Patka less than a month after she entered into the contract with Pinzur and that payments were substantially complete within five months of her discharge from the hospital.

Pinzur focuses on its correspondence with Hartford and stresses that no payment had been forthcoming to either the providers or Patka until after it became involved. Plaintiff contends that the trial court ordered payment because of Hartford's bad faith and refusal to honor Pinzur's lien. The record reflects that the providers had not been paid within the first few months after Patka's hospitalization, that Patka was receiving final billing notices and collection action

threats from the providers, and that the first benefits check was not drafted until after Pinzur began its correspondence with Hartford.

It is evident to us that there remain genuine issues as to whether or not there was an actual dispute between Patka and Hartford, and whether Pinzur recovered anything for Patka in the statutory sense. There is disagreement as to whether Hartford paid benefits voluntarily or was prompted to do so by Pinzur's actions. Obviously this issue is material since, if payment did not come about "on account" of attorney services, there was no "recovery" of Patka's claim, Pinzur's lien is unenforceable, and its award is patently unreasonable. Summary judgment should not have been applied where a genuine issue of material fact had not been resolved. (*Bohnen International, Inc. v. Liberty Mutual Insurance Co.* (1983), 120 Ill. App. 3d 657, 662, 458 N.E.2d 644.) This matter must be remanded for a hearing on the fact question of whether Pinzur's services caused Hartford to pay Patka's providers. Resolution of that issue will determine the enforceability of Pinzur's lien. We would anticipate that the hearing would also adduce evidence sufficient to determine whether the amount of Pinzur's award, if there is one, is reasonable.

The judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded with directions to hold a hearing in accordance with this opinion.

Affirmed in part, reversed in part, and remanded with directions.

LINDBERG, P.J., and WOODWARD, J., concur.