(No. 68434.—

*In re* WILLIAM J. GERARD, Attorney, Respondent.

*Opinion filed December 21, 1989.*

Samuel J. Manella, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George T. Donoghue, Jr., of Chicago, for respondent.

JUSTICE STAMOS delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission (the Administrator) filed a one-count complaint charging respondent, William J. Gerard, with charging and collecting an excessive fee, in violation of Rule 2—106(a) of the Code of Professional Responsibility (the Code) (107 Ill. 2d R. 2—106(a)). The Administrator also charged respondent with the following misconduct arising out of the same factual allegations: conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 1—102(a)(4) of the Code (107 Ill. 2d R. 1—102(a)(4)); overreaching; prejudicing and damaging a client during the course of the professional relationship in violation of Rule 7—101(a)(3) of the Code (107 Ill. 2d R. 7—101(a)(3)); and conduct involving moral turpitude.

Of these charges, the Hearing Board found respondent had collected an excessive fee in violation of Rule 2—106(a) and had engaged in conduct involving dishonesty, fraud, and deceit in violation of Rule 1—102(a)(4). The Hearing Board recommended respondent be suspended from the practice of law for a period of six months. While the Review Board adopted the Hearing Board's findings of fact and conclusions of law, it found respondent's conduct constituted "extreme overreaching," and the Review Board thus recommended a one-year suspension.

Respondent filed exceptions to the Review Board's report and recommendation, asserting that the Review Board had erred in making certain findings of fact, in failing to dismiss the charge of a Rule 1—102(a)(4) violation either because the complaint failed to state a cause

of action or because the Administrator failed to bear his burden of presenting clear and convincing evidence of a Rule 1—102(a)(4) violation, in finding that respondent's conduct constituted extreme overreaching, and in recommending the sanction of suspension for one year. The Administrator also filed exceptions to the Review Board's report and recommendation, contending that the Board should have recommended that respondent be disbarred. We granted both petitions (107 Ill. 2d R. 753(e)(6)).

## FACTS

This disciplinary proceeding arises out of the attorney-client relationship between respondent and Ruth Randolph, which began in August 1985. Because Ruth Randolph died before the Administrator filed the complaint, the sole evidence of what occurred between respondent and Randolph is respondent's testimony and certain documents. Even so, respondent and the Administrator disagree on some facts, and respondent denies the correctness of some findings of fact made by the Hearing Board and the Review Board.

As we discuss later, we do not find that any of the factual errors mentioned by respondent are critical, and we base our conclusions on undisputed facts. It is these facts, construed in respondent's favor where necessary, which we recite here.

As of August 1985, respondent had practiced law for 24 years, concentrating his practice in the area of Federal taxation. The relationship between Randolph and respondent began in early August 1985, when Margaret O'Boyle contacted respondent and asked him to telephone Randolph, who wanted a will. At this time, Randolph was 84 years old and was hospitalized for an injury suffered in a fall. Her closest relative was a niece. When respondent telephoned Randolph, she told him

that, besides wanting him to prepare a will, she wanted respondent to help her find, or as respondent phrases it, "recover," certain paper assets she owned that were missing; she told respondent that she believed they had been taken by someone at the hospital.

Over the phone, respondent discussed with Randolph his fee for his services in "recovering" the assets; he told her that either he could charge her a rate of $175 per hour, or they could agree to a contingent fee. Randolph said she preferred the contingent fee arrangement.

On August 20, 1985, respondent visited Randolph in the hospital to discuss these matters. Before this meeting, respondent prepared the following document as the contingent fee agreement:

> "This is to confirm my understanding that William J. Gerard Ltd. will receive as a retainer an amount equal to one-third of all assets recovered for the undersigned."

This was the first contingent fee contract respondent had drafted in his career, yet while drafting it he did not consult any form books or other sources. Respondent, however, had served on the Chicago Bar Association's Professional Fees Committee for four years.

At the time respondent prepared this agreement, he did not know the nature of the paper assets that were missing, their value, or the complete circumstances surrounding their disappearance. At the August 20, 1985, meeting, some of these details were clarified. Randolph told respondent that the assets she was concerned about were certificates of deposit she held in seven financial institutions which she named. Randolph also told respondent that she was not receiving interest on these certificates. Although respondent now had some information, he still did not know how many certificates of deposit Randolph thought were missing, or their total value.

Respondent explains that at the time he and Randolph entered into the contingent fee agreement he suspected that litigation might be necessary to "recover" the certificates of deposit; he speculated that someone might make an adverse claim to them, or possibly the certificates of deposit had been wrongfully redeemed by someone who had stolen them, requiring a lawsuit against the banks that allowed their redemption.

At the August 20, 1985, meeting, respondent and Randolph also agreed that respondent would prepare a trust agreement and a will with a pour-over provision. Randolph accepted respondent's advice to place stock she owned, as well as the certificates of deposit if they were "recovered," in this trust, with herself and respondent named as co-trustees. When he left Randolph that day, respondent left the contingent fee agreement with her.

Two days later, respondent met with Randolph again. Randolph executed the will and trust agreement respondent had prepared; for this work, respondent charged Randolph a fixed fee of $250. Randolph also gave respondent the contingent fee agreement, which she had signed. Thus, respondent entered into the first contingent fee agreement of his career.

During the next month, respondent contacted all of the institutions mentioned by Randolph as having issued the certificates of deposit. Respondent discovered that all of the funds represented by the certificates were still safe in accounts under Randolph's name. Respondent also discovered that the total value of these certificates was approximately $450,000. The actual value of the certificates turned out to be $453,443.37.

On September 26, 1985, Randolph gave respondent a list of the banks she had named on August 20 and the number of certificates of deposit which each bank held

for her, for a total of 23. This matched with the information respondent had discovered already.

Now that he had identified the missing certificates of deposit, respondent's next step was to reregister each of them in the name of the trust he had established. Respondent accomplished all of this work by telephoning, visiting, and writing letters to the banks and by visiting Randolph. At no time were any adverse claims made by third persons, and at no time did litigation become necessary. At the hearing, respondent conceded that his actions in identifying and reregistering these certificates were basically administrative in nature, required no legal skills, and could have been done by Randolph herself if she had been able-bodied. Respondent claims to have spent 160 hours "recovering" these certificates. Apparently, respondent completed the "recovery" of all the missing certificates of deposit sometime in October 1985, within two months of when he had been hired by Randolph; but respondent has never stated the date on which he reregistered the last certificate of deposit.

Respondent began collecting his contingent fee on October 10, 1985, when he redeemed two certificates of deposit, now registered in the trust's name, and deposited the money in his corporate account as a portion of his contingent fee. (These redemptions on October 10, 1985, support the conclusion that respondent succeeded in "recovering" and reregistering all of the certificates of deposit by early October, because contingent fees are only to be collected when it is clear how much money the client has received, and therefore how much money the attorney deserves as his percentage.) On various dates over the next three months, respondent redeemed eight more certificates of deposit. On January 10, 1986, respondent redeemed the tenth certificate of deposit, which because it was unmatured was reduced by a penalty of $225, and deposited the resultant sum of $40,275

in his corporate account. Through this method of redeeming 10 of the 23 certificates of deposit registered in the trust's name respondent succeeded in collecting a total fee of $159,648.60; this exceeds one-third of the $453,443.37 value of the certificates of deposit "recovered" by respondent.

The day before, on January 9, 1986, Randolph signed a document revoking the trust agreement. In this revocation Randolph instructed respondent as co-trustee to deliver to her all trust assets and trust documents, and to render an accounting for all transactions made during the trust's existence. Randolph mailed this revocation to respondent, who states that he did not receive it until January 14, 1986.

Respondent followed these instructions and delivered the documents to Randolph on or about January 31, 1986. At the same time, Randolph signed a release which respondent had prepared, and which stated that Randolph acknowledged the return of the trust assets and released respondent from "all claims in connection with the trust." On that date also, Randolph showed respondent the original certificates of deposit, which had been found.

Seven months later, in August 1986, Randolph died. At no time did Randolph request a renegotiation of respondent's fee. At no time did respondent ever suggest to Randolph that they should renegotiate his fee.

Margaret O'Boyle, however, was not satisfied. In June 1986 she filed a complaint regarding respondent's $159,648.60 fee with the Attorney Registration and Disciplinary Commission (the Commission). O'Boyle also filed an action in the circuit court of Cook County, individually and as executrix of Randolph's estate, seeking the return of the fee. O'Boyle and respondent settled the civil action in November 1987, four months after the Administrator filed his complaint. They renegotiated re-

spondent's fee down to $28,000, which represents 160 hours of work at respondent's hourly rate of $175, and respondent repaid the estate the difference of $131,648.60, plus interest. As part of this settlement, O'Boyle signed a release as to all claims arising out of respondent's representation of Randolph. One clause in this release is of particular interest to this proceeding, for it states:

> "Gerard has asserted and continues to assert a right to said fees paid to him based on the terms of a disputed contingency contract between Randolph and Gerard for the recovery of certificates of deposit, other assets and professional services rendered."

As a result of O'Boyle's complaint to the Commission, the Administrator filed a disciplinary complaint against respondent. This complaint alleged most of the pertinent facts recited above.

After receiving the Administrator's complaint, respondent filed a motion to dismiss, arguing that the Administrator had violated the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—603(b)) by pleading five separate causes of action in one count; the Hearing Board denied this motion. Respondent then filed a demand for a bill of particulars, requesting the Administrator to specify, *inter alia*, the acts and words of respondent which allegedly constituted conduct involving dishonesty, fraud, deceit, and misrepresentation; the Hearing Board denied this demand. Then respondent filed his answer, admitting that he had charged Randolph a $159,648.60 fee, but denying that this was excessive or that he had violated any Code provisions.

A panel of the Hearing Board conducted a hearing at which respondent and two character witnesses testified. The Hearing Board then filed its report and recommendation, recommending that respondent be suspended from the practice of law for six months. The Hearing

Board concluded that the fee was excessive and predatory, and that respondent had engaged in conduct involving dishonesty, fraud and deceit; it also concluded that the fee contract did not establish a contingent fee, at least as the contract was enforced, because contingent fees are collected only if recovery is achieved through settlement or litigation, yet in this case there was no contingency because no adverse claims challenging Randolph's right to the certificates of deposit were ever made by third persons.

Respondent and the Administrator filed exceptions with the Review Board. While the Review Board adopted the findings and conclusions of law of the Hearing Board, it increased the severity of the recommended sanction to a one-year suspension. The Review Board also made two of its own conclusions: The respondent's conduct was extreme overreaching, and respondent acted fraudulently when he entered into the fee agreement with Randolph because at that time there were no assets to be recovered (yet neither the Review Board nor the Hearing Board made the factual finding that respondent knew this when he entered into the agreement).

To this court, respondent now admits that the fee he collected was excessive, but he argues error by the Review Board. The Administrator argues that the recommended sanction is too lenient and urges us to disbar respondent.

## ANALYSIS

### Respondent's Challenges to the Findings of Fact

Respondent's brief sets out nine findings of fact contained in the Review Board's report that he considers to be incorrect and unsupported by the evidence. After reviewing the evidence in light of respondent's conten-

tions, we consider it necessary to discuss only two of these nine allegedly "egregious" errors, because only these two could bear significantly on our judgment of respondent's conduct; therefore, we want to make our view of them clear. As to the other findings, either they are supported by clear and convincing evidence in the record, or, although they are errors, they are immaterial to our analysis of the ethical impropriety of respondent's conduct.

The two significant findings made by the Review Board are: (1) that Randolph advised respondent on January 9, 1986, one day before he redeemed the last certificate of deposit for $40,275, that she was revoking the trust and discharging respondent as attorney; and (2) that respondent "knew that Ms. Randolph had mislaid the passbooks evidencing ownership." When judging the ethical nature of a respondent's conduct and assessing a sanction, this court defers to findings of fact made by the Hearing Board as the trier of fact, unless the findings are not supported by clear and convincing evidence. (*In re Harth* (1988), 125 Ill. 2d 281, 287; *In re Enstrom* (1984), 104 Ill. 2d 410, 416.) The Review Board's findings of fact must meet the same test before we will adopt them. *In re Mitan* (1979), 75 Ill. 2d 118, 124.

Regarding the Hearing Board's finding that respondent learned on January 9, 1986, that Randolph had discharged him, we agree with respondent that it is not supported by clear and convincing evidence. Respondent's answer to the Administrator's request to admit facts is the sole evidence of when respondent received the document revoking the trust and demanding a return of all trust assets and an accounting (which we assume was the equivalent of a discharge although respondent denies he was discharged); respondent's answer stated that he received the document in the mail on January 14, 1986. There is no evidence that respondent learned

of his discharge earlier by any other means. Thus there is no clear and convincing evidence that when respondent redeemed a certificate of deposit for $40,275 on January 10, 1986, as part of his fee he did so knowing Randolph had discharged him the day before. As a result, we do not consider this as fact when we judge the ethical nature of respondent's conduct.

We also agree with respondent that there is no clear and convincing evidence supporting the Review Board's finding that respondent "knew" that Randolph had mislaid the certificates of deposit, for respondent, the only possible source of such evidence, never admitted that he knew this. Moreover, the Review Board could not have based this finding of fact on its impression of respondent's demeanor as a witness because respondent never testified before the Review Board. Yet looking at the Review Board's use of the word "knew" in context, we think that it simply made a poor choice of words, not an "egregious" error as respondent claims. In its report the Review Board seemed to say that because respondent had learned by the end of September that all of the funds represented by the certificates of deposit were accounted for, and because no adverse claims were ever made, respondent "knew" that Randolph, an 84-year-old woman recently hospitalized, had mislaid the certificates of deposit and that they had not been stolen. While we cannot say that respondent "knew" this, he certainly should have considered it to be a distinct possibility. We, therefore, do not base our judgment on respondent's knowing for a fact that the certificates were mislaid.

Next, we discuss in greater detail the propriety of the fee which respondent charged Randolph, and the subject of contingent fees in general.

### The "Contingent" Fee Agreement

Although respondent no longer denies that he col-

lected an excessive fee in violation of Rule 2—106(a), we think it is important to state that we agree with the Review Board's finding that respondent violated this rule. Also, we think it is important to review the subject of contingent fees, and to point out that this entire incident arose from respondent's ignorance of contingent fees, ignorance which he did not bother to rectify, and which caused him to draft a badly worded fee agreement and, apparently, to poorly advise his client both before and after she agreed to the fee agreement.

We would have thought it was general knowledge among the members of the bar that a contingent fee is to be collected only if an attorney successfully champions the legal rights and claims of his client, with the result that the client is compensated through a settlement with, or judgment against, those who denied his claims. This court stated as much 26 years ago in *Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 78, when we stated that an attorney's collection of a contingent fee "depend[s] upon the success or failure to enforce a supposed right." In addition, Rule 2—106(c)(1) of the Code clearly states that a contingent fee agreement is an "agreement for the provision of legal services by a lawyer under which the amount of the lawyer's compensation is contingent in whole or in part upon the successful accomplishment (by settlement or litigation) of the subject matter of the agreement." (107 Ill. 2d R. 2—106(c)(1).) Furthermore, Rule 2—106(c)(3) (107 Ill. 2d R. 2—106(c)(3)) requires that a contingent fee agreement detail the precise method to be used in determining the fee, including whether expenses are to be deducted before or after the percentage is applied, and whether the percentage will vary depending on the stage—settlement, trial, or appeal—at which the case is concluded.

Respondent's defense in this proceeding is ignorance: Because he had never entered into a contingent fee

agreement before, he was ignorant of the proper form and ignorant of the Code's provisions on collecting an excessive fee. But if respondent, realizing his ignorance of contingent fees despite. his four years of service on the Chicago Bar Association's Professional Fees Committee, had sought to remedy it by doing the research necessary to draft a proper contingent fee agreement, presumably he would not now be before us; it would have been clear to him that he could not charge a one-third contingent fee because he did not "recover" Randolph's certificates of deposit by means of a settlement or judgment. Instead of doing this research, respondent decided to use the term "recovered" in the fee agreement without further clarification. Even so, the term "recovered" suggests reobtaining the certificates of deposit from somewhere outside of Randolph's sphere of control; yet at all times Randolph owned the funds represented by the certificates, although she did not have conscious actual possession of the paper certificates. As the appellate court has explained, the term "recovered" requires. that an attorney's recovery of property or monetary compensation for a client result from action taken by the attorney; otherwise the attorney receives an unjust windfall. *Robert S. Pinzur, Ltd. v. The Hartford* (1987), 158 Ill. App. 3d 871, 881 (interpreting the term "recovered" in the Attorneys' Lien Act (Ill. Rev. Stat. 1985, ch. 13, par. 14), and finding that no recovery was made when an insurance company paid a claim as a matter of course, not as a result of the attorney's services).

Respondent comments in his brief that Randolph never asked him to renegotiate his fee, and he testified that Randolph authorized him to redeem the unmatured certificate of deposit that he redeemed on January 10, 1986. But a client's acquiescence to an attorney's misconduct does not purge it of its unethical character. (See

*In re Himmel* (1988), 125 Ill. 2d 531, 542, citing *In re Thompson* (1963), 30 Ill. 2d 560, 569 (absence of client complaints about respondent's misconduct does not render him immune from discipline). Furthermore, Randolph's failure to ask for a renegotiation likely resulted from respondent's never explaining to Randolph the correct terms of a contingent fee—the fee is paid only if there is a settlement or judgment resolving the situation in the client's favor—due to respondent's own ignorance. In addition, respondent apparently never explained to Randolph what actions he took to "recover" the certificates of deposit; while respondent testified that he reported to Randolph as he received information, he has never said that he explained to her how he was achieving the "recovery." Regardless, the unethical nature of respondent's actions in collecting an excessive fee is not ameliorated by Randolph's failure to question him about it or to file a complaint with the Commission.

In essence, the contingent fee agreement was based on a mutual mistake of fact—that someone had stolen the certificates of deposit and would either make a claim to them or wrongfully redeem them. But respondent, an attorney who learned all the facts concerning the status of the certificates of deposit and the need simply to reregister them, contrary to his initial expectations, never sought reformation of the agreement.

We conclude that respondent charged Randolph an excessive fee, and thereby violated Rule 2—106(a). "[A] lawyer of ordinary prudence would [have been] left with a definite and firm conviction that [a $159,648.60] fee [was] in excess of a reasonable fee" (107 Ill. 2d R. 2—106(b)) for the nonlegal services of identifying the certificates of deposit that Randolph owned, and having them reregistered, even if it did take 160 hours over a period of two months.

Next, we address respondent's argument that the Administrator failed to state a cause of action when he charged that respondent had violated Rule 1—102(a)(4), and that the Administrator also failed to present clear and convincing evidence of this violation.

## The Charge of Fraudulent Conduct

The Administrator's complaint began by alleging, *inter alia*, the facts that respondent received a $159,648.60 fee, by redeeming 10 specified certificates of deposit, in exchange for his services of requesting the financial institutions where Randolph had certificates of deposit to reissue them in the name of the newly formed trust; the Administrator's complaint then charged that these acts constituted five different kinds of unethical conduct, including conduct involving dishonesty, fraud, deceit, or misrepresentation violating Rule 1—102(a)(4). After receiving the complaint, respondent filed with the Hearing Board first a motion to dismiss, which the Board denied, and then a demand for a bill of particulars, which the Board also denied. In both pleadings respondent argued that the form of the complaint—charging that respondent was guilty of various types of unethical conduct based on the same set of facts—prejudiced him because he did not know which facts were relevant to which charges of unethical conduct.

Respondent now argues that the charge of misconduct violating Rule 1—102(a)(4) should be dismissed for failure to state a cause of action, and that the Hearing Board erred in denying his demand for a bill of particulars. Respondent further argues that the Administrator failed to bear his burden of proving a violation of Rule 1—102(a)(4) by clear and convincing evidence, and thus when sanctioning him this court cannot consider this charged but unproved Code violation.

Respondent argues that the complaint fails to state a cause of action that he violated Rule 1—102(a)(4) because it does not allege the specific false statements made by respondent, that respondent knew these statements were false when he said them, that he said them intending to deceive or defraud Randolph, and which of respondent's acts were intended to deceive, and did deceive, Randolph. According to respondent, a cause of action for fraud in the context of a disciplinary proceeding must contain such specific allegations. We disagree.

The complaint sufficiently stated a cause of action for conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 1—102(a)(4) insofar as his collection of an excessive fee can also be characterized as a violation of Rule 1—102(a)(4). A complaint filed by the Administrator with the Hearing Board must "reasonably inform the attorney of the acts of misconduct he is alleged to have committed." (107 Ill. 2d R. 753(b); *In re Harris* (1982), 93 Ill. 2d 285, 292.) Although an attorney usually can be disciplined only for misconduct that is charged in a complaint, a disciplinary complaint need not be as specific as a criminal complaint. (*E.g., Harris*, 93 Ill. 2d at 292; but see *In re Broverman* (1968), 40 Ill. 2d 302, 307 (respondent may be disciplined for uncharged misconduct if it was effectively encompassed by the charged misconduct, and if respondent was not misled or prejudiced); *In re Thompson* (1963), 30 Ill. 2d 560, 566-67 (respondent can be disciplined for uncharged misconduct if the finding was based solely on respondent's own testimony).) More recently, this court stated that a disciplinary complaint not only must contain sufficient information to reasonably inform the respondent of the conduct that he must defend as acceptable under the Code, but also must state every fact essential to prove the specific charged misconduct. *In re Beatty* (1987), 118 Ill. 2d 489, 499-500 (affirming dismissal of a disciplinary com-

plaint against six attorneys charging them with knowingly making false statements, *inter alia*, but failing to allege how certain statements made by a committee they had created were false, what facts were true, and that respondents knew that the committee's statements were false when made, and, most importantly, failing to specify which of the six respondents were responsible for which statements, making it difficult for each to defend himself).

Respondent was reasonably informed that he was charged with a violation of Rule 1—102(a)(4) due to his collecting a $159,648.60 fee, which the Administrator alleged was excessive, to reregister Randolph's certificates of deposit. The complaint also alleged all facts essential to establish a Rule 1—102(a)(4) violation: respondent's services consisted of reregistering the certificates in the trust's name, and he collected a fee of $159,648.60, which was excessive. We hold that the Administrator stated a Rule 1—102(a)(4) cause of action. For the same reasons, we hold that the Hearing Board did not abuse its discretion when it denied respondent's demand for a bill of particulars.

In addition, we find that the Administrator proved by clear and convincing evidence that respondent's conduct constituted fraud. Collecting an excessive fee in and of itself can constitute fraud subject to discipline under Rule 1—102(a)(4); intent to defraud or to deceive is not an element.

Unfortunately, when the Hearing Board concludes in its report that respondent "engaged in conduct involving dishonesty, fraud, and deceit in violation of 1—102(4) [*sic*]" it does not specify to what conduct it is referring; from the report, however, we deduce that the Hearing Board is referring to respondent's collecting the excessive fee, not to any other false statements or deceptive conduct that were unalleged in the complaint. The Hear-

ing Board could have concluded validly that this conduct was fraudulent under Rule 1—102(a)(4).

This court has adopted a broad definition of fraud: Fraud is any conduct, statement, or omission that is " 'calculated to deceive.' " (*In re Segall* (1987), 117 Ill. 2d 1, 7, quoting *In re Armentrout* (1983), 99 Ill. 2d 242, 251 (forgery is fraudulent conduct violating Rule 1—102(a)(4)); see also *Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99 (fraud includes all acts and omissions involving a breach of legal or equitable duty, trust, or confidence; action to establish a constructive trust).) The Hearing Board, which observed respondent's demeanor when he testified, reasonably could have found clear and convincing evidence that respondent never explained to Randolph the simple procedures he used to "recover" the certificates of deposit (respondent testified only that he reported back to Randolph as he got information, not that he explained to her what he was doing and that no adverse claims had been made), and could have further found that by failing to explain this to Randolph while collecting a $159,648.60 fee respondent engaged in fraudulent conduct by omission. Thus, there is clear and convincing evidence upon which the Hearing Board could have based a finding that respondent engaged in conduct involving fraud as that term has been defined by this court.

In addition, we conclude that respondent's conduct was constructive fraud, and that the scope of Rule 1—102(a)(4) encompasses constructive fraud. Constructive fraud does not require as an element that the actor have a dishonest purpose or an intent to deceive, and constructive fraud can be inferred from the parties' relationship and the circumstances. (*E.g., Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 843-44.) The appellate court has further defined constructive fraud as:

"any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence. *** [It is] a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others." (*In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568.)

In the present case, the attorney-client relationship between respondent and Randolph was a fiduciary relationship as a matter of law. (*E.g., Coughlin v. SeRine* (1987), 154 Ill. App. 3d 510, 515.) We hold that when respondent collected the excessive fee of $159,648.60 from Randolph as payment for his services in connection with the "recovery" of the certificates of deposit, and then failed to initiate a renegotiation of his fee, respondent breached his fiduciary duty and, as a consequence, committed a constructive fraud; we so hold even though there is no evidence that respondent intended to cheat or to defraud Randolph.

This, however, has not been the Administrator's argument as to how respondent's conduct constituted fraud; before the Hearing Board, the Review Board, and this court, the Administrator has argued that respondent acted fraudulently because, when he entered into the agreement making his fee contingent on whether he recovered the missing assets, there were no assets to be recovered. The Review Board adopted this reasoning when it found that "Respondent's conduct in entering into a contingent fee agreement whereby he was to receive one-third of the assets when there were no assets to be recovered is fraud." We disagree, and hold that the Administrator did not state a cause of action for fraud under Rule 1—102(a)(4) based on this argument. The complaint contained no factual allegations supporting such an argument and reasonably informing respondent

that the Administrator viewed respondent's act of initially entering into the fee agreement as dishonest or fraudulent. For example, the complaint did not state the contingency aspect of the fee or explain that while the agreement used the word "recovered" Randolph's right to the certificates of deposit was never questioned, and so they never needed to be "recovered"; instead, the complaint merely stated that respondent had the certificates of deposit reregistered and for that received an excessive fee of $159,648.60.

Furthermore, the Administrator did not prove his argument about respondent's fraudulent conduct by clear and convincing evidence. (See, *e.g.*, *Enstrom*, 104 Ill. 2d at 416 (Administrator must prove each allegation by clear and convincing evidence).) To prove this argument, the Administrator would have had to introduce evidence that when Randolph and respondent entered into the fee agreement on August 22, 1985, respondent knew for a fact that Randolph had merely misplaced the certificates of deposit, and therefore no adverse claims would be made and no assets would need to be "recovered." Yet the Administrator presented no evidence directly or inferentially establishing such knowledge by respondent. In addition, the Hearing Board, which observed respondent's demeanor when he testified, and whose findings are accepted if based on clear and convincing evidence (*e.g.*, *In re Harth* (1988), 125 Ill. 2d 281, 287), did not find that when respondent entered into the fee agreement he knew there were no assets to be recovered. Thus, the Review Board, with no direct evidence of such knowledge, and not having observed respondent testify, erred in making the above conclusion of law.

We judge respondent's conduct in entering into the contract in light of the circumstances existing on August 22, 1985, and we cannot conclude that he acted fraudulently at that time. (See *In re Teichner* (1984), 104 Ill. 2d

150, 158 (although insurance company paid claim in normal course of business, respondent's conduct in entering into a contingent fee agreement was not improper because at time he did so he did not know that claim would not be challenged).) Thus, not only does the complaint fail to state a cause of action for fraud in entering into the fee agreement, but the Administrator also failed to present clear and convincing evidence of such fraud. For the same reasons, we hold that the Hearing Board did not err when it denied respondent's demand for a bill of particulars.

To summarize, we conclude that by collecting an excessive fee from Randolph respondent violated Rule 1—102(a)(4) of the Code, as well as Rule 2—106(a). It is for this ethical misconduct that we will sanction respondent.

## THE SANCTION

This court now has the grave responsibility of deciding the proper sanction for respondent's unethical conduct. (*E.g., In re Pappas* (1982), 92 Ill. 2d 243, 247.) We base our judgment as to the sanction warranted by respondent's conduct on those factual allegations in the complaint which the Administrator proved by clear and convincing evidence, respondent's own admissions (see *In re Thompson* (1963), 30 Ill. 2d 560, 566-67), the qualitative nature of respondent's conduct, his attitude in the disciplinary proceeding, and his past record. See *In re Anderson* (1972), 52 Ill. 2d 202, 213.

Both respondent and the Administrator are dissatisfied with the sanction recommended by the Review Board, a one-year suspension. Whereas respondent asks this court merely to reprimand or censure him, the Administrator seeks nothing less than disbarment.

Respondent presents many reasons why we should merely reprimand or censure, not suspend, him. Respondent presents one of these reasons when he avers

that because the Administrator did not prove the charge that respondent's conduct involved "dishonesty, fraud, deceit, or misrepresentation" in violation of Rule 1— 102(a)(4) of the Code, we cannot consider this charge when we determine his sanction. We held earlier in this opinion that respondent acted fraudulently when he collected the excessive fee, for constructive fraud is inherent in the collection of an excessive fee. When sanctioning respondent, however, we do not count the number of ethical rules which he violated concurrently by the same conduct, and increase the severity of the sanction the higher that number is. Instead, we analyze and pass judgment upon the unethical nature of respondent's conduct as a whole. (For this same reason, as well as the fact that the Administrator did not argue to the Hearing Board or the Review Board that respondent's conduct constituted overreaching, moral turpitude, and conduct prejudicial to a client, we do not consider whether respondent's conduct was also unethical in these ways.)

Besides respondent's actual collection of the excessive fee, as we consider the appropriate sanction we remain aware of two related courses of conduct that were ethically improper, and that were alleged in the complaint and proved by clear and convincing evidence. (See *In re Yamaguchi* (1987), 118 Ill. 2d 417, 425 (supreme court will consider clearly established facts as to which Hearing Board did not make express findings).) One of these is the manner in which respondent collected his excessive fee.

By virtue of his position as co-trustee of the trust which he had set up for Randolph, and to which he advised Randolph to transfer ownership of the certificates of deposit, respondent redeemed 10 of the 23 certificates of deposit and deposited the proceeds directly into his corporate account. Respondent stated that Randolph authorized him to redeem the tenth certificate of deposit.

But respondent has presented no documentary evidence of his authority to redeem the 10 certificates of deposit, even though the trust agreement required that before he, as co-trustee, sold any trust assets he had to receive written authorization from Randolph. Furthermore, he began redeeming the certificates of deposit on October 10, 1985, yet it is not clear whether on that date, less than two months after he was hired, respondent had "recovered" all 23 certificates of deposit by means of re-registration, and whether he still contemplated possible litigation. The method and hasty manner which characterized respondent's collection of his excessive fee suggests that Randolph was ignorant of it, at least early on; it also suggests either that respondent knew at an early date that Randolph's right to the certificates of deposit would be unchallenged (in other words, he was collecting a contingent fee knowing that there was no contingency), or that respondent was improperly collecting portions of his fee before he knew Randolph's rights were secure, contrary to the very justification for contingent fees.

The other ethically improper course of conduct was respondent's having Randolph sign a release when he returned the remaining securities to her along with an accounting. This document stated that Randolph released respondent from "any and all claims in connection with the trust." Apparently, when Randolph signed this document she had not received independent legal advice on whether she should sign it, and respondent had not suggested that before signing she should seek such advice. This entire situation reflects badly upon respondent's professional standards. See *In re Schuyler* (1982), 91 Ill. 2d 6.

Respondent recites facts which he believes justify mitigation of any sanction we decide to impose. Respondent stresses that when first asked to represent

Randolph he was having severe back pain for which he was not being properly treated; as a result, he had difficulty attending to his current client matters, and so was not anxious to take on new work. Yet because it is his practice to draw up wills for those who want them, respondent explains that he agreed to do so for Randolph. Granted, the recovery of missing assets was a different matter, but respondent protests that he was not anxious to undertake this work either.

Seemingly, respondent believes that by painting a picture of himself as a reluctant attorney tortured by back pain he will persuade us to judge the ethical nature of his misconduct by some different standard than we would if he had been healthy and underemployed. We are not persuaded. Respondent's back pain is not a valid excuse and does not mitigate the unethical nature of his conduct. Even if respondent truly took on this onerous added burden of "recovering" Randolph's assets purely out of benevolence, his motive does not justify his collecting an excessive fee.

Respondent also notes that no other disciplinary action has been filed against him in his career, and that this occurrence happened more than three years ago. Furthermore, his good character is evidenced by his active participation in various groups in his home community for years, his recent election to the board of trustees for Barrington Township, and the *pro bono publico* legal work he has done during his career; at the hearing, two character witnesses testified that he has a very good reputation for honesty and integrity among Chicago attorneys.

We give due weight to each of these factors. But the passing of three years since respondent collected the excessive fee is irrelevant. As to the weight of respondent's *pro bono publico* legal work, his own testimony reveals that it has not been extensive enough to

significantly mitigate the sanction we impose. Similarly, the other factors respondent cites as mitigating show that he has interests outside the law and that he has not been accused of other unethical behavior, but they do not substantially affect our judgment on a fitting sanction. See *In re Himmel* (1988), 125 Ill. 2d 531, 546.

Respondent also asks us to mitigate the sanction we impose because he has made full restitution to Randolph's estate; but the Administrator rightfully casts doubt on the motive behind, and ethical nature of, respondent's conduct in making "full restitution." The full restitution he refers to is the settlement of O'Boyle's action, which reduced his fee from $159,648.60 to $28,000, representing 160 hours of work, at $175 per hour and within a two-month time period. In exchange for this reduction of respondent's fee, O'Boyle signed a release of all claims arising out of respondent's representation of Randolph and his position as trustee. Apparently, only the reality of litigating the validity of his $159,648.60 fee spurred respondent to renegotiate it.

The purity of respondent's motives in making this restitution is also put in doubt by two additional facts. One is that the restitution was made about four months after the Administrator filed the disciplinary complaint. The other is a clause in the release stating that respondent "continues to assert a right to said fees paid to him based on the terms of a disputed contingency contract between Randolph and Gerard for the recovery of certificates of deposit, other assets and professional services rendered." Clearly, although respondent made restitution, he did so contrary to his belief as to his rights.

This court has said before that "[w]hile restitution may be an element to consider in determining the seriousness of the misconduct charged, such restitution of funds does not preclude inquiry into the moral and professional quality of respondent's acts." (*In re Power*

(1950), 407 Ill. 525, 531 (respondent did not do the work for which he was paid, and his return of the fees only after complaints were filed with the disciplinary commission revealed his intention to retain the funds until forced to return them); accord *In re Fox* (1988), 122 Ill. 2d 402, 410 ("[s]ettlement with a client does not preclude inquiry into the moral and professional qualities of an attorney's acts prior to settlement and in connection therewith *** [and] failure to promptly attempt to make restitution of funds wrongfully retained generally does not enhance the confidence which the public and this court place in that attorney"); *In re Rosenberg* (1953), 413 Ill. 567, 573 (respondent's restitution of converted funds did not make the conversion less fraudulent).) In the present case, while the restitution given by respondent weighs in his favor, it weighs lightly due to surrounding circumstances and his belief at the time that he had a right to the entire $159,648.60.

It is this attitude of respondent that he deserves and has a legal right to the $159,648.60 fee, an attitude he largely maintains before this court, that we find most disturbing. Although now conceding that his fee was excessive, during oral argument before this court respondent's counsel still refused to recognize that the fee was improper or unfair. Counsel also refused to recognize that respondent, after realizing he would not have to "recover" the assets from anyone making adverse claims, had any duty to approach Randolph, to tell her the type of work he did to "recover" the certificates of deposit, and to suggest that they negotiate a reduced fee. In his written brief, respondent restates his testimony as to why he did not initiate the renegotiation of his fee before O'Boyle filed the probate action and before the Administrator filed the disciplinary complaint. Respondent's explanation was that "he was never asked to." Yet notably respondent's testimony never suggested

that he let Randolph know there was ever a reason to renegotiate his fee because the type of work he ended up doing was not what he, and possibly Randolph, had contemplated would be necessary. Thus, while respondent knew all the facts warranting a reduction of his fee, the evidence does not show that Randolph knew those facts and so had reason to ask him to reduce his fee.

At the hearing, respondent maintained an even more self-justifying view of his conduct, admitting only that he had "made a mistake based on all the information I know now." Asked a direct question whether—at the time of the hearing—he thought the fee was improper, respondent answered: "I don't think it was improper of me \*\*\*." In response to a direct question whether—at the time of the hearing—he thought the fee was excessive, respondent evaded; he said: "I think—I have no reservations about having negotiated the settlement we did work out."

Maintaining this attitude, respondent further defends himself and his conduct by pleading ignorance of the Code's provisions on contingent fees and the customary format of contingent fee contracts, and, at the same time, by complaining that the Code contains no clear rules about what an attorney is to do if the services he provides are less extensive than the services he contemplated when he entered into the fee contract. But respondent never testified that he had consulted the Code, knowing he had charged an excessive fee but not knowing how to correct the situation, had found no guidance in the Code, and so, uncertain what to do, had decided to do nothing. Nonetheless, respondent argues that any sanction should be reduced because the Code contains no clear rules on this subject. In addition, respondent notes that this was the first contingent fee agreement he had entered into in 24 years of practice.

Respondent's duplicity in both pleading ignorance of the Code and complaining that there are no clear Code rules he could have followed—if he had chosen to consult the Code—to remedy his collection of the excessive fee does not serve him well in our judgment. Ignorance of the Code is no excuse. (*In re Demuth* (1988), 126 Ill. 2d 1, 13 (attorneys who fail to understand and follow the disciplinary rules do so at their peril); *In re Cheronis* (1986), 114 Ill. 2d 527, 535 (every member of the bar has a paramount obligation to study the Code and abide by its principles).) Nor is it an excuse that an attorney's personal code of ethics does not recognize certain conduct as wrongful. All attorneys in this State are held to the same ethical standards. If respondent realized that his fee was excessive and violated Rule 2—106(a) of the Code, and if respondent then searched the Code for what he should do but found no clear rules, still, he knew that his fee was excessive. The Code is not a manual designed to instruct attorneys what to do in every conceivable situation. Once an attorney realizes he has charged an excessive fee, he must use his own common sense to conclude that he must reduce that fee after consulting with his client; the Code's failure to detail this commonsense conduct is not a loophole which attorneys can use to evade discipline.

We do consider in mitigation that this was the first contingent fee respondent had ever collected. Yet this mitigating factor weighs lightly because respondent testified that for four years he was a member of the Chicago Bar Association's Professional Fees Committee; consequently, we find it difficult to believe that respondent truly did not know the proper form for contingent fee agreements and that contingent fees are customarily collected only when recovery is made through settlement or litigation.

As we consider respondent's case, we bear in mind that " '[w]hen determining the nature and extent of discipline to be imposed, the respondent's actions must be viewed in relationship "to the underlying purposes of our disciplinary process, which purposes are to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public." (*In re LaPinska* (1978), 72 Ill. 2d 461, 473.)' " (*In re Levin* (1987), 118 Ill. 2d 77, 87, quoting *In re Crisel* (1984), 101 Ill. 2d 332, 343.) We also recall Chief Justice Ward's warning that "[u]nwarranted lenity can be as injurious to the public interest and to the integrity of the profession as unwarranted severity." *LaPinska*, 72 Ill. 2d at 473-74 (Ward, C.J., specially concurring).

Respondent urges us to follow our own policy of "striv[ing] for a degree of consistency in imposing sanctions in cases that are similar." (*In re Ettinger* (1989), 128 Ill. 2d 351, 371; see, *e.g., In re Pappas* (1982), 92 Ill. 2d 243, 248.) Respondent believes that, if we do, the most severe sanction we can impose on him is censure because that is the most severe sanction this court has ever imposed for collecting an excessive fee. While it is true that censure is the most severe sanction we have ever imposed for collecting an excessive fee, in only one case have we ever disciplined an attorney solely for this misconduct. For many reasons, we do not feel bound to follow that case, *In re Kutner* (1979), 78 Ill. 2d 157. Additionally, although we try to impose uniform sanctions, we have repeatedly explained that each case must be judged on its own unique facts. *E.g., In re Yamaguchi* (1987), 118 Ill. 2d 417, 428.

The facts in *Kutner* are dissimilar to the facts in the present case, and therefore a similar sanction is not appropriate. In *Kutner*, an attorney charged a $5,000 fixed fee for handling "a routine battery case which never

went to trial," and on which the attorney spent 6 to 10 hours. (*Kutner*, 78 Ill. 2d at 166.) The evidence clearly established that he had collected an excessive fee. But, in contrast to the present case, the Hearing Board had recommended merely a private reprimand, and the Review Board had recommended censure. Also in contrast to the present case, in *Kutner* this court found as mitigating factors that the respondent had practiced for almost 50 years without any other disciplinary complaints being lodged against him, and that during those 50 years respondent had engaged in substantial *pro bono publico* activities.

Both the occurrence facts in *Kutner* (particularly the fact that the fee was a fixed fee) and the mitigating factors in that case render *Kutner* so dissimilar to the present case that we do not here impose the *Kutner* court's sanction of censure. Our policy is similar discipline for similar misconduct, and the misconduct in *Kutner* is simply too dissimilar to the conduct of respondent for us to apply that policy here. Moreover, at the time *Kutner* was decided, this court had not adopted the Code, and considered the Code as merely " 'a safe guide for professional conduct,' " which if violated could result in discipline, but which did not bind attorneys registered with this court to the same extent as it does now. See *In re Krasner* (1965), 32 Ill. 2d 121, 129.

Nor does the decision in *In re Teichner* guide us in sanctioning respondent, for though the facts of the collection of an excessive fee in *Teichner* are similar to the facts in the present case, the sanction of disbarment in *Teichner* was also based on the respondent's conversion of funds and previous two-year suspension for solicitation. *In re Teichner*, 104 Ill. 2d at 165-68.

Respondent declares that he is capable of acting with integrity in the future. Accordingly, he argues that suspending him will "serve neither the public's nor the pro-

fession's interests," but will hurt him financially. To the contrary, we think the public's and the profession's interests will be served by suspending respondent. Respondent's conduct implicates two of the three purposes of our disciplinary process: maintaining the integrity of the legal profession, and safeguarding the public. Without a suspension the integrity of the legal profession will be damaged in the minds of the public, especially because respondent's transgression was collecting an excessive fee and the public is particularly skeptical about the fees charged by attorneys, a fact we must recognize when determining the appropriate sanction. In addition, suspension will serve to safeguard the public.

Ours is a self-regulating profession, and also a profession which each attorney is privileged to practice. The trust and confidence members of the public repose in attorneys will only survive if attorneys consistently conduct themselves with integrity. Our self-regulating profession must remain aware of this. Unethical conduct, especially in attorneys' relationships with clients, must not and will not be taken lightly by the profession or by this court. In particular, respondent's attitude throughout this episode of his professional life demonstrates a failure to understand his duties to his clients, and either inability to recognize ethical problems or intentional disregard of professional ethics.

Therefore, considering respondent's conduct in his relationship with Randolph, the factors he presents in mitigation, his attitude since collecting the excessive fee, and our continuing responsibilities in disciplining attorneys in this State, we order that respondent be suspended for one year.

*Respondent suspended.*