In re: SULZER HIP PROSTHESIS
AND KNEE PROSTHESIS
LIABILITY LITIGATION

No. 1:01–CV–9000.

United States District Court,
N.D. Ohio,
Eastern Division.

Oct. 31, 2003.

Daniel E. Becnel, Jr., Reserve, LA, Don Barrett, Barrett Law Office, Lexington, MS, James R. Dugan, II, Gauthier, Dow-

ing, Labarre, Beiser & Dean, Metairie, LA, John R. Climaco, Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH, Keith M. Fleischman, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, R. Eric Kennedy, Weisman, Kennedy & Berris, Cleveland, OH, Richard S. Wayne, Strauss & Troy, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Steven E. Clark, Clark & Mitchell, PC, Oklahoma City, OK, Wendell H. Gauthier, Gauthier, Downing & La-Barre, Metairie, LA, Charles R. Parker, Hill & Parker, Houston, TX, David W. Zoll, Zoll & Kranz, Toledo, Debra J. Horn, Meyers, Roman, Friedberg & Lewis, Cleveland, OH, Janet G. Abaray, Lopez Hodes Restaino Milman Skikos Polos, Cincinnati, OH, John T. Murray, Murray & Murray, Sandusky, Lee Squitieri, Squitieri & Fearon, New York City, Mary B. McKee, Hickman & Lowder, Phillip A. Ciano, Ciano & Goldwasser, Cleveland, OH, Stephen B. Murray, Jr., Murray Law Firm, New Orleans, LA, Steven M. Tindall, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, Sylvia Antalis Goldsmith, Murray & Murray, Sandusky, Timothy J. Gallagher, Schwarzwald & McNair, Cleveland, OH, John L. Davidson, Frazer Davidson, P.A., Jackson, MS, Michael E. Cox, Biloxi, MS, Glen Edward Hazen, Jr., Morgan, Hazen & Galbreath, Cincinnati, Laura Citrano, Iverson Yoakum Papiano & Hatch, Neil Papiano, Iverson Yoakum Papiano & Hatch, Los Angeles, CA, Tracy Annette Smith, Morgan, Hazen & Galbreath, Cincinnati, OH, for Plaintiff in Sulzer Orthopedics Inc. Hip Prosthesis and Knee Prosthesis Products Liability Litigation, Thomas Reynolds, Gradys Hodge, Matthew Murnane, Carletta Murnane, Plaintiffs.

J. Patrick Herald, Baker & McKenzie, Richard M. Franklin, Baker & McKenzie, Chicago, IL, Sheryl Medeiros, Skadden Arps Slate Meagher & Flom, San Francisco, CA, David W. Brooks, Shook, Hardy & Bacon, Kansas City, MO, James J. Dries, Baker & McKenzie, Chicago, IL, Jeffrey M. Whitesell, Arter & Hadden, Cleveland, OH, Bradley D. Honnold, Shook, Hardy & Bacon, Harvey L. Kaplan, Shook, Hardy & Bacon, Matthew D. Keenan, Shook, Hardy & Bacon, Kansas City, MO, Richard F. Scruggs, Scruggs Law Firm, Pascagoula, MS, Sidney A. Backstrom, Scruggs Law Firm, Oxford, MS, Kenneth M. Seeger, Crosby, Heafey, Roach & May, San Francisco, CA, Irene C. Keyse–Walker, Arter & Hadden, Cleveland, Robert C. Tucker, Tucker Ellis & West, Cleveland, Steven J. Boranian, Reed Smith Crosby Heafey LLP, San Francisco, CA, Werner L. Polak, Shearman & Sterling, New York City, Bridget M. Brennan, Baker & Hostetler, Mary M. Bittence, Baker & Hostetler, Cleveland, OH, for Sulzer Medica, Sulzer Medica Ltd., Sulzer Orthopedics Ltd., Sulzer Orthopedics Inc., Sulzer Orthopedics Incorporated, Sulzer Medica USA Inc., Sulzer A.G., Sulzer USA Holding Co., Centerpulse Orthopedics, Inc. fka Sulzer Orthopedics Inc. dba Sulzer Medica, Centerpulse USA Inc, Centerpulse USA Holding Company, Centerpulse Ltd. fka Sulzer Medica AG fka Sulzer Medica Ltd. aka Centerpulse AG Centerpulse Orthopedics Ltd. fka Sulzer Orthopedics Ltd., Defendants.

## *MEMORANDUM AND ORDER*

O'MALLEY, District Judge.

### I.

The Court has received notice, both from individual class members and also from the Claims Administrator, of a recurring problem regarding the calculation, award, and payment of contingent attorney fees to individual attorneys for certain plaintiff class members in this case. Because this problem is not uncommon, and because it raises ethical concerns, the

Court issues this Order. For the reasons explained below, the Claims Administrator and all counsel for plaintiffs in this case are hereby **ORDERED** to comply with the following directives.[1]

*Any* contingent fee agreement between an attorney and a plaintiff class member in this case, which was entered into *after February 2, 2002* and was intended to allow the attorney to recover contingent fees in this case, is neither ethical nor permissible, and may not be enforced. Accordingly, *no person may take any steps to enforce any such agreement, and any attorney who has obtained contingent fees pursuant to such a contract shall return those fees to the plaintiff class member.* That attorney may, instead, seek reimbursement *only* pursuant to Claims Administrator Procedure No. 9 ("CAP 9"), entitled "Contingent Fee Contracts Entered into after February 2, 2002."

Further, the Court **DIRECTS** the Claims Administrator to make every effort to ensure that counsel for all plaintiffs in this case comply with this Order,[2] and to **NOTIFY** the Court if an attorney appears to be acting in contempt of this Order. The Court further directs the Claims Administrator to allow attorneys who fall within this category a reasonable period of time to file a claim for CAP 9 attorney fee benefits.

## II.

### A. *Litigation and Settlement.*

Before addressing the recurring contingent attorney fee problem, the Court pro-. vides some brief background.[3] Sulzer Orthopedics, Inc. ("Sulzer Orthopedics") is a Texas-based designer, manufacturer, and distributor of orthopedic implants for hips, knees, shoulders, and elbows. One of the products manufactured by Sulzer Orthopedics is known as the "Inter–Op acetabular shell," which is one component of a system used for complete hip replacements. In early December of 2000, Sulzer Orthopedics announced a voluntary recall of certain manufacturing lots of its Inter–Op shells, because it had "received reports of post-operative loosening" of some of the Inter–Op shells, apparently "related to a reaction of the [human] body to a slight residue of lubricant used in the manufacturing process." Sulzer Orthopedics recalled approximately 40,000 units of its Inter–Op shell, of which about 26,000 had already been implanted in patients.

After Sulzer Orthopedics discovered the problem with the Inter–Op shells, the company reviewed its manufacturing processes for its other medical implant products. This review led Sulzer Orthopedics to discover that it had used a similar manufacturing process during its fabrication of an implant product known as the Natural Knee II Tibial Baseplate. Just as it did with the Inter–Op shell hip implants, Sulzer Orthopedics voluntarily notified the public that a problem existed with certain Natural Knee tibial baseplates. The problem occurred during production of about 1,600 Natural Knee baseplates, about 1,300 of which were implanted in patients.

Shortly after Sulzer Orthopedics issued its voluntary recall of its Inter–Op shells in

---

**1.** While the Court is aware of the identity of over thirty attorneys who have taken steps in contravention of this Order, the Court chooses not to publicly identify them at this juncture.

**2.** These efforts should include notification by the Claims Administrator to appropriate claimants for whom CAP 9 benefits have not been sought, explaining the terms of this Order.

**3.** A more complete historical and procedural background of this case is set out in docket no. 738 at 3–22.

December of 2000, a number of plaintiffs around the country filed lawsuits, in both state and federal courts. Similarly, shortly after Sulzer Orthopedics issued the voluntary recall of its Natural Knee II implants, patients who had received these implants also filed lawsuits around the country, in both state and federal courts. In early 2001, pursuant to 28 U.S.C. § 1407, three different federal plaintiffs with Inter–Op shell hip implants filed motions with the Federal Judicial Panel on Multi–District Litigation ("MDL Panel"), seeking to consolidate and centralize 30 of the federal lawsuits. MDL docket no. 1401. On June 19, 2001, the MDL Panel granted these motions, consolidating and transferring all related pending federal litigation to the Northern District of Ohio and assigning oversight of the MDL proceedings to the undersigned. Initially, the consolidated litigation involved only cases related to the Inter–Op shells. On September 5, 2001, however, the MDL Panel transferred to this Court a case involving a Natural Knee tibial baseplate implant, because it involved questions of fact similar to those in the Inter–Op shell cases. Eventually, virtually all of the federal cases involving the Inter–Op shells and Natural Knee baseplates were transferred to this Court.

In August of 2001—shortly after the MDL Panel transferred the federal litigation to this Court—the parties filed a motion for an order conditionally certifying a plaintiff class, and a motion for preliminary approval of a class settlement. During hearings on these motions, the parties informed the Court that Sulzer Orthopedics had located manufacturing problems associated with the hip implants at issue in this litigation, and that both it and Sulzer Medica, Ltd. were prepared to provide certain settlement funds for purposes of providing benefits to those injured by the implants. The parties explained that they had agreed to engage in further inquiry to determine whether those two Sulzer entities should contribute additional sums to the settlement, and whether Sulzer AG, a Swiss entity, should also contribute to the settlement. On August 29, 2001, the Court granted the motions for conditional certification of an opt-out settlement class and preliminary approval of the proposed settlement agreement. Although the Court did preliminarily conclude that the proposed settlement was fair and reasonable and adequate, the Court took special note of the parties' representation that the settlement agreement was designed with the understanding that plaintiffs' counsel would have a period of time to pursue further discovery regarding the open issues referenced above. The Court noted that this discovery period would "ensure an extremely thorough viewing of the defendants' financial circumstances by those persons most interested in ensuring that, in fact, the defendants are 'suffering' the maximum judgment they can withstand." Order at 38–39 (docket no. 61). Given the statements by the Sulzer defendants about having located manufacturing problems and their willingness to quickly provide a monetary remedy, the parties did not intend to focus their discovery efforts on issues of liability or causation.

Over the next several months, counsel for the plaintiff class undertook extensive discovery of the defendants, learning in detail: (1) the strengths and weaknesses of Sulzer AG's jurisdictional defenses; (2) the financial condition of all of the defendants; and (3) the availability of insurance proceeds to help fund the settlement. Counsel for the parties also engaged in ongoing and hard-fought negotiation during this period regarding the total amount and apportioning of settlement funding. The parties kept the Court informed of their progress on an almost daily basis; this was especially true during the month of January 2002, when the negotiations

were most intensive and sometimes required Court intervention. Finally, on Friday, February 1, 2002, the parties signed a "Memorandum of Understanding," which was essentially the outline of a full settlement agreement, containing the critical terms (both financial and otherwise) upon which they had agreed to end their dispute. Sulzer Orthopedics, Sulzer Medica, Ltd., and Sulzer AG all signed this Memorandum of Understanding, in which all three agreed to contribute to the settlement. Winterthur, the insurance carrier for all defendants, also agreed to contribute insurance proceeds to the settlement. While the parties understood that they still had to draft a more detailed document that set out all the particulars of their agreement, it was clear that settlement had been reached, subject to approval by the Court and the clearing of certain contingencies (e.g., the defendants could withdraw from the settlement if there was an excessive number of opt-outs by plaintiff class members). The parties subsequently submitted a full draft of their settlement agreement, which the Court preliminarily approved on March 13, 2002. *See* docket no. 232.

The parties' new settlement agreement was substantially more favorable to the Plaintiff Class than was the first settlement agreement the Court had preliminarily approved on August 29, 2001. The primary improvement was that the "funding value" of the Final Settlement Agreement was approximately $1.045 billion, or about $447 million more than the first settlement agreement. The day after the parties signed their Memorandum of Understanding, they publicized their agreement extensively. Sulzer posted an announcement on its website on February 2, 2002 that began as follows:

Sulzer Medica, the Swiss medical device company, has achieved a decisive breakthrough for its Austin, Texas-based subsidiary Sulzer Orthopedics Inc. in settlement negotiations related to hip and knee implant litigation.

An enhanced and definite term sheet for settlement was signed by all parties involved and submitted to U.S. District Court Judge Kathleen O'Malley in Cleveland, Ohio. This definitive proposal is the result of intense negotiations that included the plaintiffs' attorneys, resulting in significant advantages to all.

At the same time, Sulzer also issued an identical press release.[4] The national and international press picked up on this announcement and quickly reported it around the world. *E.g.,* "Sulzer Reaches Deal over Defective Artificial Joints," *Agence France–Presse,* 2002 WL 2331181 (Feb. 2, 2002); "Breakthrough in U.S. Litigation—Sulzer Medica Reaches Final Agreement on Enhanced Term Sheet," *Chemical Business Newsbase: Abbott Laboratories News & Report,* 2002 WL 4520668 (Feb. 3, 2002); "Company to Pay $1B for Faulty Hip," *AP Online,* 2002 WL 11687281 (Feb. 3, 2002); "Sulzer Medica To Pay $1 Billion For Faulty Joints," *Wall Street Journal Europe* at 5 (Feb. 4, 2002); "Sulzer Medica Settles Hip Suits," *Financial Times,* 2002 WL 3315948 (Feb. 4, 2002); "Sulzer Offers $1 Billion Settlement for Defective Implants," *N.Y. Times Abstracts* 2, 2002 WL 11168484 (Feb. 4, 2002).

In addition to the general publication of the news that the parties had reached a settlement agreement, the settlement terms were broadcast specifically to all attorneys who had made appearances in this case and also to the national plaintiffs' bar. For example, plaintiff's liaison counsel promptly published the Memorandum of Understanding on its own website, and

---

**4.** The full text of the announcement / press release is available via the internet at: *http:* *//www.sulzermedica.com/center pulse/Company/CompanyNews/PressReleases.html*

also engaged in multiple conference calls with attorneys around the country to explain its terms. On March 12, 2002, the parties finally finished drafting a complete, integrated Settlement Agreement. The Court then held a Final Fairness Hearing on May 2, 2002. Although the size of the Plaintiff Class exceeded 30,000 individuals (not including derivative claimants), the Court received only 30 or so objections to the fairness of the revised settlement agreement, and all but seven objections were withdrawn before the final fairness hearing. Among the witnesses at this hearing were a number of attorneys, representing hundreds of class members, who had vehemently objected to the first proposed settlement agreement; these attorneys now testified in *support* of the final proposed settlement agreement. Indeed, there was *no* witness who testified in opposition to the final proposed settlement agreement and no attorney who argued against its approval. These statistics underscore the degree to which the parties' February 1, 2002 Memorandum of Understanding was a result of negotiations that had incorporated and resolved the concerns of the plaintiffs' bar. On May 8, 2002, the Court entered an Order granting final certification to the national Plaintiff Class and sub-classes, and granting final approval to the settlement agreement between the Plaintiff Class and the Sulzer Defendants. *See* docket no. 340.[5]

The Final Settlement Agreement contained at least three important provisions regarding attorney fees, and the Court has

had to issue a number of opinions in connection with these provisions. First, the Settlement Agreement provided that certain attorney fees and expenses would·be paid out of the settlement funds to attorneys who had "contributed to the creation of the Settlement Trust through work devoted to th[e] 'common benefit' of Class Members." Settlement Agreement at § 1.1(v) (docket no. 361). Thus, the Court has issued several Orders awarding Common Benefit Expenses and Attorney Fees. *See* docket nos. 738, 753, 868, & 1067.

Second, the Final Settlement Agreement provided that one of the benefits payable to the plaintiff class members was "a portion of the attorney fees owed by Class Members to their attorneys under [their] private [contingency] fee agreements." Settlement Guide at 12 (*see* docket no. 243, Exhibit 4, at § IV.F, p. 12).[6] Specifically, "[a]s a benefit to the Class Member, the Sulzer Settlement Trust shall pay a portion of the Class Member's attorney fees. This contribution to the attorney fees shall be equal to 23% of the stated benefit × 1.25." *Id.* at 13. Thus, for example, a plaintiff who received an APRS ("Affected Product Revision Surgery") benefit of $160,000 was entitled to receive, in addition, an attorney fee benefit of 23% × 1.25 × $160,000, or $46,000. Settlement Agreement at §§ 3.4(a) & 5.1. This $46,000 amount might, or might not, satisfy the plaintiff's contractual obligation to his attorney; if not, the attorney was permitted to obtain the difference from his client.[7] Because a few attorneys had diffi-

---

5. Because this Final Settlement Agreement provided that the Sulzer defendants retained the right to terminate and withdraw from the Agreement at any time prior to May 31, 2002, the Court's May 8, 2002 Order was not a final, appealable Order. After the Sulzer Defendants elected not to exercise their right to terminate the Agreement, however, the Settlement Agreement became irrevocable and the Court entered an Order on June 4, 2002, confirming its May 8, 2002 Order and dis-

missing all settled claims with prejudice. *See* docket no. 353.

6. The Settlement Guide may also be viewed on the internet at the Claims Administrator's website, *http://www.sulzerimplantsettlement.com.*

7. An example: If the plaintiff and his attorney signed a 33 ⅓ % contingency fee contract before February 2, 2002, and the plaintiff was

culty calculating the total amount of contingent attorney fees they were owed, and had trouble accounting for the portion of those contingent fees paid by the Settlement Trust, the Court issued an explanatory Order. *See* docket no. 620 (*"Sebastien Order"*).

The third important provision in the Settlement Agreement regarding attorney fees underlies the recurring problem that the Court now addresses with this Order. The Court's discussion of this provision follows under separate heading.

*B. Contingent Attorney Fees.*

*1. Factual Background.*

As noted above, and as discussed at length in the *Sebastien Order*, the Settlement Agreement provided plaintiff class members with the benefit of a contribution toward contingent attorney fees. An important codicil, however, was that this benefit was available only to plaintiffs who entered into contingent fee contracts with their attorneys *"on or prior to February 2, 2002."* *See* Settlement Agreement at § 5.1 ("nothing in this agreement is intended to void or to otherwise alter reasonable contingent fee contracts entered into on or prior to February 2, 2002"); *see* Settlement Guide at 12 ("[p]rivate fee agreements entered into prior to February 2, 2002 will not be affected by this Settlement ...."). If the plaintiff class member entered into the contingency fee contract with his attorney *after* February 2, 2002,

the attorney fee benefits available to that class member are described in Claims Administrator Procedure No. 9 ("CAP 9"), entitled "Contingent Fee Contracts Entered into after February 2, 2002."

In relevant part, CAP 9 states, in essence, two things.[8] First, CAP 9 provides that, if the plaintiff class member and his attorney signed their contingent fee contract after February 2, 2002, then the plaintiff is entitled to receive an attorney fee benefit of no more than $10,000, based on the hours the attorney worked and the attorney's hourly rate. *See* CAP 9, ¶ 2. Second, CAP 9 provides that, to receive this additional attorney fee benefit, both the plaintiff and the attorney must agree that the benefit is "payment in full for all fees owed by the Class Member to the Settling Attorney in connection with the Class Member's Settled Claim." *Id.* at ¶ 3(ii).

The reason the parties agreed that the amount and calculation of the attorney fee benefit should change as of February 2, 2002 was their recognition that, after that date, there was no longer any substantial *contingency*—the parties had agreed on the primary and critical terms necessary to settle their dispute, so the questions of liability and the amount of damages for class members who did not opt out were no longer open. Thus, § 5.1 of the Settlement Agreement reflects the parties' acknowledgment that any "contingent" fee contract entered into between an attorney

---

entitled to a $160,000 APRS benefit, the plaintiff was also entitled to a contingent attorney fee benefit of $160,000.00 × 1.25 × 23%, or $46,000. The plaintiff's *contractual obligation* to the attorney, however, was $160,000.00 × 1.25 × 33⅓ % or $66,666.67. Thus, the attorney could demand from the plaintiff the difference of $20,666.67. *See generally* docket no. 620 (*"Sebastien Order"*). Based on the materials submitted to the Court in connection with applications for the award of Common Benefit Attorney Fees and Ex-

penses, it appears that a substantial number of claimants' counsel accepted the settlement benefits in full payment for their services, foregoing the right to seek additional funds out of awards made to their clients from the Settlement Trust.

8. The entirety of CAP 9 may be viewed on the Claims Administrator's website at: *http://www.sulzerimplantsettlement.com/claimsadmin.htm.*

and a participating class member after that date was essentially based on a false premise. After February 2, 2002, it was no longer the case that an attorney representing a class member would receive compensation *contingent* upon successful performance. CAP 9, however, recognizes that an attorney who is hired after February 2, 2002 to assist a plaintiff with filling out claim forms is still entitled to compensation for his or her time, but only based on a reasonable hourly rate.

Unfortunately, as stated in a letter from the Claims Administrator to the Court, "some attorneys have simply refused to ask for the CAP 9 subsidy," and are instead insisting on receiving contingent fees from their clients, taken out of their clients' awards. That is, some attorneys are using the following faulty reasoning: (1) my client and I entered into a contingent fee contract; (2) according to the settlement agreement and my contingent fee agreement, I am entitled to a contingent fee equal to 1.25 times my contingency percentage times the "affected product benefit" amount my client receives [as an example: 1.25 × 33 ⅓ % × $160,000, or $66,666.67] [9]; (3) the settlement agreement also says that, instead of my client paying me this entire $66,6666.67 amount directly out of his "affected product benefit," the Claims Administrator will pay to my client, as an *additional* "attorney fee benefit," 1.25 times 23% times the "affected product benefit" amount my client receives [in this example, 1.25 × 23% × $160,000, or $46,-000], and I am free to collect the remaining contingent attorney fee amount [$20,-666.67] from my client, if I wish; (4) the settlement agreement and CAP 9 also say, however, that, if my client and I entered into our contingent fee contract after February 2, 2002—which we did—the Claims

Administrator will only pay an additional attorney fee benefit of $10,000, at most; (5) the settlement agreement and CAP 9 go on to say that, for my client to get this additional $10,000 (or less) attorney fee benefit from the Claims Administrator, I have to agree that the $10,000 (or less) is *full payment* of attorney fees by my client; (6) I do not want to accept only $10,000 (or less) as full payment of attorney fees, when my contract says my client owes me [in this example] $66,666.67; (7) it is not fair that, just because my client and I signed our contract after February 2, 2002, I should have to accept only $10,000 (or less) in attorney fees, instead of $66,666.67; (8) to remedy this unfairness, I will simply not agree to accept the $10,000 (or less) from the Claims Administrator, and I will not seek this attorney fee benefit on my client's behalf; and (9) instead, I will tell my client he owes me the full contractual contingent fee amount of $66,666.67, which he has to pay me out of his "affected product benefit" of $160,000.

Of course, by following this reasoning, the client will wind up, in the end, with far less money—in this example, only $93,333.33, instead of $160,000 plus payment of up to $10,000 in attorney fees. The attorney, however, will wind up with far more money—in this example, $66,666.67, instead of $10,000 (or less).[10] Indeed, the attorney will wind up receiving more money than other counsel who, in otherwise similar circumstances, executed contingency fee agreements with clients before the February 2, 2002 cut-of date—because many such counsel have agreed to accept the $46,000 settlement benefit in full satisfaction of their clients' obligations to them.

---

9. For a detailed discussion of this calculation, see the *Sebastien Order* at docket no. 620.

10. Also, this example ignores the question of expenses, which the attorney will normally collect from his client.

As might be expected, a number of class members whose attorneys have taken this position have complained to the Court and the Claims Administrator. As explained by the Claims Administrator, in summarizing the complaint of one such class member:

> The Class Member has ... complain[ed] that his attorney has not sought an Attorney Fee subsidy on the Class Member's behalf because doing so would limit the attorney's recovery under the contingent fee contract between the Class Member and the attorney. The Class Member ... object[s] to this refusal on the grounds that his attorney's election to not seek the Attorney Fee subsidy has operated to increase the level of the Class Member's indebtedness to his attorney.

> \*   \*   \*   \*   \*   \*

Because CAP 9 operates to limit the force of post-February 2, 2002 contingent fee contracts, and the value of those contracts to some Class Members' attorneys, some attorneys have simply refused to ask for the CAP 9 Attorney Fee subsidy. \* \* \* The consequence to that Class Member is that his attorney's fee is higher than CAP 9 would otherwise provide, and the Class Member is slated to receive no subsidy of the attorney fee at all. The fee the Class Member's attorney anticipates collecting, however, remains the same. The net result is a smaller cash disbursal to the Class Member for whose benefit the Trust was created in the first place.

The Claims Administrator has estimated that attorneys for over 40 class member plaintiffs have, in one way or another, put their clients in the position described above.[11]

### 2. This Court's Jurisdiction.

■ The contingency fee agreement between a given class member plaintiff and his attorney is, of course, a contract, and questions regarding the interpretation and enforcement of contingency fee contracts are normally questions of state law. *See, e.g. In re Thamann,* 152 Ohio App.3d 574, 789 N.E.2d 654 (2003) (holding that a probate court should consider Ohio state law rules of court and Ohio disciplinary rules to determine the reasonableness of a 40% contingent attorney fee contract); *Gallon & Takacs Co., L.P.A v. Franklin,* 2000 WL 491739 (Ohio App. 6 Dist. April 28, 2000) (relying on state law to rule in a case where the plaintiff law firm sued its client to collect on a contingency fee agreement). Conceivably, then, plaintiff class members should bring their complaints about their attorneys, and their questions about the enforceability or interpretation of their contingent fee contracts, to the courts and/or disciplinary bodies located in the States where they live. In other words, it is arguable that this Court should not exercise jurisdiction over the type of class member complaint discussed here.

■ The Court concludes, however, that it is both appropriate and necessary to address the issues raised by these class members. As an initial matter, the Settlement Agreement itself provides that

> [t]he Court shall retain exclusive and continuing jurisdiction of the Complaint, the Parties, all Class Members (other than a Class Member who exercises an Opt–Out Right pursuant to Section 3.8), Sulzer, Sulzer AG and the other Re-

---

11. In some cases, the attorney has refused to ask for the CAP 9 attorney fee benefit, despite the client's wishes; in some cases, the attorney has not asked for the CAP 9 benefit, but obtained a waiver from his client authorizing the attorney to waive the benefit and receive the full contingent fee amount; and in some cases, the attorney has not asked for the CAP 9 benefit, and it is unclear whether the client understands the import of this choice.

leased Parties, and over this Settlement Agreement with respect to the performance of the terms and conditions of the Settlement Agreement, to assure that all disbursements are properly made in accordance with the terms of the Settlement Agreement, and to interpret and enforce the terms, conditions and obligations of this Settlement Agreement. Agreement at ¶ 9.1. This broad-reaching provision certainly allows, if not requires, the Court to address any dispute that could reasonably be construed as affecting the benefits received by a plaintiff class member. Accordingly, the Court clearly has jurisdiction over the issues raised by the class member plaintiffs here, given that: (1) the Settlement Agreement explicitly addresses the issue of contingent attorneys fees; (2) the Court has previously issued Orders regarding entitlement of attorneys to contingent attorney fees; and (3) as the Claims Administrator notes, the actions of the class members' attorneys "result [in] a smaller cash disbursal to the Class Member for whose benefit the Trust was created in the first place."

Furthermore, as the Sixth Circuit Court of Appeals has made clear, "although attorneys' fee arrangements are contracts under state law, the federal court's interest in fully and fairly resolving the controversies before it *requires* courts to exercise supplemental jurisdiction over fee disputes that are related to the main action." *Kalyawongsa v. Moffett,* 105 F.3d 283, 287–88 (6th Cir.1997) (emphasis added); see *Krause v. Rhodes,* 640 F.2d 214, 218 (6th Cir.1981) ("[a] federal district court judge has broad equity power to supervise the collection of attorney's fees under contingent fee contracts"). As a general rule, "court's have a special concern to supervise contingent attorney fee agreements." *McKenzie Construction, Inc. v. Maynard,* 758 F.2d 97, 101 (3rd Cir.1985); see *Allen v. United States,* 606 F.2d 432, (4th Cir.1979)

("[t]he district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established"); *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1108 (3rd Cir. 1979) ("contingency agreements are of special concern to the courts and are not to be enforced on the same basis as are ordinary commercial contracts").

■ This special concern is magnified even more in class-action cases. In this case, for example, the present fee disputes directly affect the total amounts disbursed by the Claims Administrator from the Trust to the plaintiff class, the total amount of benefits a given plaintiff class member in these circumstances will receive, and the *net* amount of benefits that such a class member will ultimately obtain. Given the extent to which the fee disputes affect the class members' benefits and the entire Class Settlement Trust, Fed. R.Civ.P. 23(e) imposes upon the court "an even greater necessity to review the fee arrangement," because this rule "imposes upon [the Court] a responsibility to protect the interests of the class members from abuse." *Dunn,* 602 F.2d at 1109 (3rd Cir. 1979). As the Fourth Circuit Court of Appeals explained, in the context of discussing a mass tort settlement:

> The court's authority to supervise members of the bar, its inherent powers to regulate attorney-client relations and compliance with ethical standards by attorneys, the equitable powers of the court under 11 U.S.C. § 105(a), and the inherent equitable powers of the court, render the contingent fee contract of attorneys representing Dalkon Shield [claimants] subject to the supervision of this court to ensure that excessive or unreasonable fees are not charged or recovered by counsel.

*In re A.H. Robins Co., Inc.,* 86 F.3d 364, 370 (4th Cir.1996), *cert. denied,* 519 U.S. 993, 117 S.Ct. 483, 136 L.Ed.2d 377 (1996)

(quoting and affirming a district court order). Indeed, this court "abuses its discretion" if it allows an attorney appearing before it to collect a contingent fee "without carefully considering the factors relevant to fair compensation." *Allen*, 606 F.2d at 435. Thus, this Court will not avoid its responsibility and merely direct the class member plaintiffs to seek help individually from state courts or state disciplinary authorities around the country regarding their fee disputes.

### 3. Legal and Ethical Rules Applying to Contingent Fee Agreements.

■ Any analysis of a fee agreement between an attorney and his client begins with the general rule that an attorney may not charge "in excess of a reasonable fee." ABA Code of Prof. Resp., Disciplinary Rule ("DR") 2–106(B); *see* ABA Model Rule 1.5(a) ("[a] Lawyer's fee shall be reasonable"); *In re A.H. Robins Co., Inc.*, 86 F.3d at 373 ("the law of this circuit has long been clear that federal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount"). Furthermore, it has "long ... been established" that "contingency fee arrangements are subject to [this] reasonableness standard." *Christian v. Gordon*, 2001 WL 883551 at *3 (Terr.V.I. June 20, 2001).

With respect to contingency fee arrangements, in particular, the Sixth Circuit Court of Appeals has noted that DR 2–106, and the related Ethical Consideration ("EC") 2–20, are "based largely upon Canon 13 of the old ABA Canons of Professional Ethics, adopted in 1908." *Krause v. Rhodes*, 640 F.2d at 219. This Canon provided that a "contract for a contingent fee ... should be reasonable under all the circumstances of the case, *including the risk and uncertainty of the compensation*, but should always be subject to the supervision of a court, as to its reasonableness." *Id.* (emphasis added). This Canon highlights the obvious but critical characteristic of a contingent fee arrangement—the presence of risk. That is why the attorney's fee is called "contingent." *See Committee on Legal Ethics of West Virginia State Bar v. Tatterson*, 177 W.Va. 356, 352 S.E.2d 107, 113–14 (1986) ("Courts generally have insisted that a contingent fee be truly contingent. The typically elevated contingent fee reflecting the risk to the attorney of receiving no fee will usually be permitted only if the representation indeed involves a significant degree of risk."). And the reasonableness of an attorney's contingent fee depends directly on whether (or to what extent) real risk is present: "[w]hen there is virtually no risk and no uncertainty, contingent fees represent an improper measure of professional compensation." *Attorney Grievance Com'n v. Kemp*, 303 Md. 664, 496 A.2d 672, 678 (1985) (quoting Formal Op. 76–1 from the Ethics Committee of the Maryland State Bar Association).

■ Benjamin N. Cardozo School of Law Professor Lester Brickman, a leading commentator in this area, explains that the "ethical justification" for contingency fee agreements is that "the lawyer's risk of receiving no fee ... merits compensation in and of itself; bearing the risk entitles the lawyer to a commensurate risk premium." Brickman, *Contingent Fees Without Contingencies: Hamlet Without the Prince of Denmark?*, 37 U.C.L.A. L.Rev. 29, 70 (Oct.1989) (hereinafter, *"Brickman"*).[12] The necessary corollary to this observation is that "charging a contingent fee grossly disproportionate to any realistic risk of nonrecovery would amount to charging a 'clearly excessive' fee." *Brick-*

---

**12.** *See* Restatement (Third) *The Law Governing Lawyers* § 35 cmt. c, at 258 (2000) ("'[a] contingent-fee lawyer bears the risk of receiving no pay if the client loses and is entitled to compensation for bearing that risk").

*man,* 37 U.C.L.A. L.Rev. at 71. In other words, "[i]n the absence of any real risk, an attorney's purportedly contingent fee which is grossly disproportionate to the amount of work required is a 'clearly excessive fee' within the meaning of Disciplinary Rule 2–106(A)." *Tatterson,* 352 S.E.2d at 114. *See* Restatement (Third) *The Law Governing Lawyers* § 35 cmt. c, at 258 (2000) ("large fees unearned by either effort or a significant period of risk are unreasonable") (hereinafter, "*Restatement*"); 1 Hazard & Hodes, *The Law of Lawyering* § 8.6 at 8.16 (3rd ed. 2000) ("[N]ot every contingent fee is justifiable by appeal to the lawyer's assumption of the risk of nonrecovery. There are situations in which the lawyer knows in advance that the contingency factor is negligible, or in which the lawyer's effort bear virtually no relationship to the size of the recovery, resulting in pure windfall."); Wolfram, *Modern Legal Ethics,* § 9.4.1 at 529 (1986) ("lawyers can use their superior knowledge of the risk and costs involved to set their percentage fee at a high figure that bears little relationship to the time and money that lawyers must put at risk").

Several cases reveal these rules in practical application. One such case is a hypothetical posed in the *Restatement* § 35 cmt. c, illus. 1, at 259. As summarized by Professor Geoffrey Hazard, "if a lawyer helps a client recover the proceeds of a [$15,000] life insurance policy, knowing that there are no grounds for the insurer to contest payment, and the company pays the entire amount upon demand, a 'standard' one-third 'contingent' fee [of $5,000] would clearly be unreasonable." *The Law of Lawyering* § 8.6 at 8–16 (citing the Restatement). A real-life example of precisely these circumstances, which speaks directly to the issues raised in this case, is presented in *Attorney Grievance Com'n v.*

*Kemp,* 303 Md. 664, 496 A.2d 672 (1985). In *Kemp,* the attorney signed a one-third contingency fee agreement with a client who was injured in an automobile accident. The attorney then wrote a letter to the client's insurer, requesting "personal injury protection (PIP) forms." *Id.* at 674. In Maryland, PIP is a mandatory, no-fault insurance coverage; payment normally follows automatically once the forms are filled out correctly, assuming an otherwise valid claim. After the attorney kept one third of the PIP payments from the insurer, the Attorney Grievance Commission charged him with violating DR 2–106, for having charged an excessive fee.

The Maryland Supreme Court concluded that the attorney had, in fact, violated the rules of ethics: "[B]ecause the services required in filling out a routine, undisputed Med. Pay claim are perfunctory in nature, contingent fees represent an improper measure of professional compensation." *Id.* at 677–78. The *Kemp* court affirmed that "filling out forms of a legal nature, simple though they may be, is certainly part of a lawyer's work, ... [and accordingly] a reasonable charge based on the time actually spent in the preparation of the claim may ethically be charged." *Id.* at 678. But when benefits are "automatically payable upon the filing of a completed benefit form and medical report," and "documentation is straightforward," then the client's receipt of those benefits "is not dependent, for the most part, on the skills of the lawyer." *Id.* at 678–79. "The risk of uncertainty of recovery is, therefore, low indeed. Under these circumstances, it would be the rare case where an attorney could properly resort to a contingency fee." *Id.* at 679.[13]

It is notable that, in *Kemp,* the forms that the attorney filled out for his client,

---

**13.** Professor Brickman cites over 20 cases with similar fact patterns and similar results in Brickman, *Contingency Fee Abuses, Ethical Mandates, and the Disciplinary System: The*

while "of a legal nature," required no specific legal expertise; the client could have probably filled them out himself. The Supreme Court of Illinois focused on the same point in *In re Gerard,* 132 Ill.2d 507, 139 Ill.Dec. 495, 548 N.E.2d 1051 (1989), to justify sanctioning an attorney for collecting an excessive fee. In *Gerard,* the client asked the attorney to help her find "certain paper assets she owned that were missing," being certificates of deposit with various banks. *Id.* at 1052. The attorney had the client sign a contingent fee agreement stating he would receive one-third of all assets he recovered. The attorney then contacted the banks named by his client, and "discovered that all of the funds represented by the certificates [of deposit] were still safe in accounts under [the client's] name." *Id.* at 1053. The attorney "accomplished all of this work by telephoning, visiting, and writing letters to the banks and by visiting [his client]." *Id.* In concluding that the attorney had acted unethically, the *Gerard* court noted explicitly that the attorney's "actions in identifying and reregistering these certificates were basically administrative in nature, required no legal skills, and could have been done by [the client] herself if she had been able-bodied." *Id.* The court also noted that, even though the client had authorized his actions and had never questioned his fee, "a client's acquiescence to an attorney's misconduct does not purge it of its unethical character." *Id.* at 1057.[14]

The Court now applies these rules applicable to contingent fee agreements to the specific circumstances of this case.[15]

---

*Case Against Case–By–Case Enforcement,* 53 Wash. & Lee L.Rev. 1339, 1358 n. 68 (1996). *See also* ABA Center for Professional Responsibility, *Annotated Model Rules of Professional Conduct* 58 (4th ed.1999) (citing *Kemp, Gerard,* and several other cases where "courts have disciplined lawyers for using contingent-fee agreements in cases presenting minimal risk of nonrecovery").

14.  There are class plaintiffs in this case who have *not objected* to their attorney's refusal to ask for the CAP 9 attorney fee subsidy, or to their attorney's insistence on receiving the full amount of contingent fees referred to in a post-February 2, 2002 contingent fee contract. Indeed, some of the attorneys for these plaintiffs have procured a *release* signed by the client, purportedly waiving any CAP 9 benefit and affirming that the attorney will receive the full contingent fee stated in a post-February 2, 2002 contract. The Sixth Circuit Court of Appeals has made clear that "the same equitable rationale that gives courts power over fee disputes arising from cases before them also allows courts to look into the reasonableness of fee arrangements." *Kalyawongsa,* 105 F.3d at 289. Thus, the lack of an objection by the plaintiff client, and even a plaintiff's waiver of CAP 9 benefits, still does not allow the attorney to collect an unreasonable fee.

15.  The Court feels compelled to note here that there is a single, but important, legal source suggesting that an attorney's use of a contingent fee agreement in circumstances similar to those in this case is *not* always unethical. The ABA Standing Committee on Ethics and Professional Responsibility, in Formal Op. 94–389, stated that, "even in cases where there is no risk of non-recovery, and the lawyer and client are certain that liability is clear and will be conceded, a fee arrangement contingent on the amount recovered may nonetheless be reasonable." This conclusion, however, has been roundly criticized. Professor Brickman, for example, rails that the Opinion is "wrong as a matter of ethics law, malevolent as a matter of public policy, disingenuous in its presentation, unfounded in the critical assumptions upon which the Opinion is based, illegitimate in its rejection of ethical considerations in favor of political partisanship, and blatantly self-interested in elevating lawyers' financial interests above their traditional fiduciary obligations to clients." Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks,* 65 Fordham L.Rev. 247, 249 (Oct.1996). Even Professor Hazard, who provides a much more balanced discussion of the ABA Opinion, concludes that it "did not come to grips with the practical realities of the contingent fee as charged on a routine basis in the United States today," and is sound only "as applied in the abstract." 1

### 4. Application.

■ As noted above, the parties in this case agreed in principle in August of 2001 to settle their dispute. The primary open questions which remained after that date were the level of funding and the precise sources of those funds. On February 1, 2002, the parties announced that they had resolved these issues and had signed a "Memorandum of Understanding," which was essentially the outline of a full settlement agreement. In other words, as of February 1, 2002, the parties had agreed upon the critical terms necessary to end their dispute, including the amount of payment to plaintiff class members, and the fact of this settlement was widely broadcast. After February 2, 2002, then, an attorney who was retained by a class member in this case knew or should have known that there was, at the very least, a markedly decreased risk of nonrecovery by his client.

The only meaningful contingency that remained after February 2, 2002, was that, under the terms of the Settlement Agreement, the defendants could withdraw from the settlement if an excessive number of plaintiff class members elected to opt out. The parties understood this contingency was fairly slim, however, for the simple reason that counsel representing the vast majority of the plaintiff class members had helped negotiate the settlement. Thus, at the Court's Final Fairness Hearing, no witness testified in opposition to the final proposed settlement agreement, no attorney argued against its approval, and every plaintiff's attorney who testified *supported* the proposed final settlement agreement. Only seven class members, out of over 30,000, maintained an objection to the fairness of the Settlement Agreement. Moreover, even to the extent this last, remaining contingency represented some level of risk of nonrecovery by a plaintiff, the period of risk was less than three months—the defendants had only until May 31, 2002, to elect to withdraw from the settlement. And, of course, after February 2, 2002, the likelihood of recovery by a given plaintiff had virtually nothing to do with his *own* lawyer's effort on his particular behalf.

The practical reality in this case is that, after February 2, 2002, an attorney's representation of a plaintiff class member did not involve a significant degree of risk that his client would not recover.[16] A lawyer

---

Hazard & Hodes, *The Law of Lawyering* § 8.6 at 8.16, 8.17 (3rd ed.2000). The Court believes its own application of the rules discussed above is well-grounded in the realities of this case.

**16.** The low degree of risk shouldered by an attorney who entered into an attorney-client relationship after February 2, 2002, may be compared with the much higher risk faced by the attorneys who initiated litigation early on, and later applied for a common benefit fee award: "the applicants expended a total of over 50,000 hours toward efforts reasonably devoted to providing a common benefit to the entire class, and advanced over $3.7 million in out-of-pocket expenses directed at providing a common benefit. If this case had not resolved as it did, at least a few of these attorneys would have suffered serious financial set-backs." *Attorney Fee Order* at 49. The Court described this risk further:

In this case, even after the parties had reached their *initial* settlement agreement, the deal almost collapsed several times; it was not until February of 2002 that settlement was essentially assured and any meaningful contingency removed. Had this settlement not occurred, all of the attorneys' common benefit work, plus their efforts on behalf of their individual clients, would have generated little or no compensation. The receipt of fees by the Fee Award applicants was clearly contingent on the successful settlement and resolution of the litigation against *all* the defendants, and their success was most certainly contingent on many factors unknown and unknowable to these applicants when they first undertook their common benefit efforts.

*Id.* at 49–50. In contrast, attorneys who entered into attorney-client relationships after February 2, 2002, knew that compensation was virtually assured.

who entered into an attorney-client relationship with a plaintiff in this case after that date knew it was extremely unlikely that he would ever have to draft any documents, conduct any discovery, make any court appearances, file any pleadings, undertake any legal research, correspond with any defendant, or negotiate with any party.[17] After February 2, 2002, an attorney knew that the only effort required to ensure his client received benefits was to: (1) monitor the case to determine whether the Court approved the Settlement Agreement at the Final Fairness Hearing; (2) watch to see if the defendants elected to withdraw from the settlement, based on opt-outs; and (3) timely and properly fill out the claims forms and submit them to the Claims Administrator. None of this effort is substantial or requires special expertise.[18] Indeed, as the *Kemp* court explained, the latter category of effort—filling out claims forms—is "perfunctory in nature" and is "not dependent, for the most part, on the skills of the lawyer." *Kemp*, 496 A.2d at 678–79. The *Gerard* court described this effort in the same way: filling in a claims form "[was] basically administrative in nature, required no legal skills, and could have been done by [the client]." *Gerard*, 139 Ill.Dec. 495, 548 N.E.2d at 1053. The accuracy of this final

observation is borne out by reports from the Claims Administrator, which reveal that the percentage of claims found valid is equal for both *represented* and *unrepresented* plaintiffs.

Despite having *reason to know* that there was a low degree of risk and a small amount of effort required to recover benefits for their clients, about 40 attorneys who signed contingent fee agreements with plaintiffs in this case after February 2, 2002 have insisted on receiving their full contingent fee. In the example discussed above in section II.B.1 of this opinion—which is a fairly representative illustration—the attorney is insisting on payment of $66,6666.67. This is handsome compensation, indeed, for what was probably far less than 50 hours work, filling out claims forms, knowing that others had already obtained a settlement of their client's claim.

"In the absence of any real risk, an attorney's purportedly contingent fee which is grossly disproportionate to the amount of work required is a 'clearly excessive fee' within the meaning of Disciplinary Rule 2–106(A)." *Tatterson*, 352 S.E.2d at 114. This Court easily concludes that, by insisting on receipt of their full contingent fee, these attorneys are charg-

17. Indeed, a strong argument can be made that attorneys who entered into contingent fee contracts with their clients at any point after August of 2001 are not entitled to a *full* contingent fee. As the Fifth Circuit noted in *In re Lawler*, 807 F.2d 1207 (5th Cir.1987):

There is no question that the attorneys are entitled to a strong application of the contingency factor for their outstanding work in resolving the contingency. But once it was resolved, its further use as a factor in the fee was not justified. Thus, the contingency factor should not be applied to the entire period of representation by counsel when a substantial portion of the legal services were provided on a noncontingent basis.

*Id.* at 1213. Before February 2, 2002, however—that is, before the final settlement was reached—it is clear that an attorney who agreed to represent a plaintiff class member ran a far greater risk that his client would not receive any benefits at all, and he (the attorney) would never receive any compensation because there remained a meaningful risk that, if the settlement funding were ultimately insufficient, the settlement would not come to fruition at all.

18. The first two tasks—monitoring the case—required nothing more than reading the newspapers or monitoring the Court's electronic docket. And even these two tasks became unnecessary for attorneys who obtained their clients after May 31, 2002.

ing an unreasonable and clearly excessive fee. These attorneys knew or should have known, before they entered into their contingent fee agreements with their clients, that the contingency factor was negligible, their effort would not bear a reasonable relationship to the size of their client's recovery, and the fee agreement would work to yield them a windfall. Moreover, their insistence on receiving the full contingent fee amount may well amount to a breach of their fiduciary relationship with their own clients. As noted above, these attorneys can only receive a full contingent fee by *purposefully failing* to apply for up to $10,000 in CAP 9 attorney fee benefits available to their client. The end result is that their client receives (in this example) only $93,333.33, instead of $160,000 plus payment of up to $10,000 in attorney fees. By failing to apply for CAP 9 benefits, the attorneys have chosen to advance their own interests over the interests of their clients.[19]

Put in the simplest terms possible: these attorneys are being greedy. They have insisted on receiving excessive compensation at the expense of their own clients. They have received far more in fees than is fair to compensate them for the amount of effort they spent and the amount of risk they took. They have violated the terms and the intent of the settlement agreement in this case, by which they are bound. And they have probably violated the rules of ethics as well.

The Court stresses that it is not requiring these attorneys to work "for free." As the *Kemp* court noted, "a reasonable charge based on the time actually spent in the preparation of the claim may ethically be charged." *Kemp*, 496 A.2d at 678. For precisely this reason, the Court provided that an attorney who entered into a relationship with a plaintiff in this case after February 2, 2002, was eligible to receive attorney fee benefits based on a reasonable hourly rate: "The Attorney Fee benefit for such Class Members shall be an amount equivalent to the number of hours of work performed by the Class Member's Attorney or law firm ("Settlement Attorney") multiplied by the usual hourly rate charged by the Settlement Attorney, provided that no attorney may bill at a rate greater than $200 per hour, and no legal

---

**19.** The *Dunn* court focused on this conflict in the context of a class action settlement, as follows:

When a contingent fee contract is to be satisfied from a settlement fund approved by the trial judge pursuant to Fed.R.Civ.P. 23(e), the court has an even greater necessity to review the fee arrangement for this rule imposes upon it a responsibility to protect the interests of the class members from abuse. In such circumstances, the role of the attorneys is drastically altered; they then stand in essentially an adversarial relation to their clients who face a reduced award to the extent that counsel fees are maximized. Moreover, because of the nature of class representation, the clients may be poorly equipped to defend their interests against those of their attorneys. Class clients are frequently widely dispersed. Even those who have dealt directly with the class attorneys may have little direct knowl-

edge of, or control over, the action. Many class action clients have not had prior experience in a lawyer-client relationship, and their financial stake in the action will often be too small to encourage significant involvement between lawyer and client. Effective client opposition to an excessive fee is therefore unlikely. Obviously in this case the defendant had no obligation to contest the distribution of legal fees from the common fund, ... nor is the court concerned with fees taxed against the defendant pursuant to statute in order to penalize it for violating the applicable law .... As a result, the only protection available to the class members in this case against the exposure to excessive fees was that afforded by the scrutiny of the district court. The district judge approved the final settlement and he was the ultimate protector of the claimants to the fund.

*Dunn*, 602 F.2d at 1109 (citations omitted).

assistant at a rate greater than $100 per hour." CAP 9, ¶ 2.[20] To insist on receiving fees nearly seven times that amount is to demand an unreasonable, excessive, and avaricious fee.

Accordingly, the Court will exercise its continuing jurisdiction over this case, the settlement trust, and the attorneys who appear before it, as follows. *At this juncture*, the Court will not refer for an ethics inquiry any of the attorneys who fall into the circumstances discussed. Rather, the Court hereby orders all attorneys representing plaintiffs in this case to ensure their actions comport with this opinion. Specifically, *any* contingent fee agreement between an attorney and a plaintiff class member in this case, which was completed *after February 2, 2002* and was intended to allow the attorney to recover contingent fees in this case, is neither ethical nor permissible, and may not be enforced. *No person may take any steps to enforce any such agreement, and any attorney who has obtained contingent fees pursuant to such a contract shall return those fees to the plaintiff class member.* That attorney may, instead, seek reimbursement *only* pursuant to CAP 9.

The Court directs the Claims Administrator to make every effort to ensure that counsel for all plaintiffs in this case comply with this Order, and to notify the Court if an attorney appears to be acting in contempt of this Order. The Court further directs the Claims Administrator to allow attorneys who fall within this category a reasonable period of time to file a claim for CAP 9 attorney fee benefits. The Court also directs the Claims Administrator to notify claimants for whom CAP 9 benefits have not been sought of the terms of this Order.

If an attorney continues to act in contravention of this Order, the Court will revisit the question of whether any discipline for breach of ethics is appropriate.

**IT IS SO ORDERED.**

---

**20.** Paragraph 2 of CAP 9 adds that: "The Attorney Fee benefit for APRS Claims, pursuant to Settlement Agreement Sections 3.4(a), 3.4(b), and 3.5(c) shall not be greater than $10,000. The Attorney Fee benefit for EIF Claims pursuant to Settlement Agreement Section 3.7 shall not be greater than $25,000."